[L.A. No. 29670. In Bank. Feb. 22, 1971.]

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
SHELL OIL COMPANY, Defendant and Appellant.

COUNSEL

McCutchen, Black, Verleger & Shea, G. William Shea, Franklin H. Wilson and Frank A. Caput for Defendant and Appellant.

Roger Arnebergh, City Attorney, Bourke Jones, James A. Doherty and Thomas C. Bonaventura, Assistant City Attorneys, and Lawrence M. Remes, Deputy City Attorney, for Plaintiff and Respondent.

## OPINION

**SULLIVAN, J.**—Defendant Shell Oil Company (Shell) appeals from a judgment, entered after a nonjury trial, awarding plaintiff City of Los Angeles (the City) the sum of $57,103.27 as a deficiency of business license taxes levied against Shell by the City for the years 1958-1961.

Shell is a large oil company which operates throughout the United States. Its headquarters are in New York, and its marketing activities are carried on through a network of regional, division, and district offices.

Among the facilities maintained by Shell in Los Angeles are a "division office" and a "bulk terminal." The division office is a general sales and marketing headquarters subordinate in the company hierarchy to the San Francisco "regional office" and superior to the various "district offices" located within the division—which includes areas outside the City itself. The bulk terminal is essentially a storage depot which is fed by pipeline from the out-of-city Wilmington refinery.

Among the functions of the division office is that of supervising wholesale sales of gasoline to retail service stations located in the districts which comprise the division. The gasoline so sold is delivered to the customer either directly from the Wilmington refinery or by truck from the Los Angeles bulk terminal. Deliveries of each kind are made to both in-city and out-of-city customers.[1]

Pursuant to the Los Angeles Municipal Code (hereafter L.A.M.C.) the City levied an assessment against Shell for unpaid business license taxes for the years 1958-1961, inclusive. After administrative hearings Shell paid a portion of the assessment and agreed to the validity of certain other portions of the City's claim relating to deliveries made to in-city customers.

---

[1] A description of the function of the district office in the sales operation will be set forth *infra*.

Remaining in controversy were, generally speaking, those portions of the alleged deficiency relating to both refinery and bulk terminal deliveries to out-of-city customers. When the Los Angeles Board of Review upheld the City's position on these matters, and Shell refused to pay the deficiency, the City commenced the present action. Judgment was entered in favor of the City, and this appeal followed.

Shell on this appeal no longer resists that portion of the alleged deficiency relating to sales of gasoline delivered from the Wilmington refinery directly to out-of-city wholesale and retail customers. Thus the only part of the assessment remaining in controversy is that relating to wholesale sales of gasoline delivered from Shell's in-city bulk terminal to retailers outside the City. The City seeks to base the tax upon Shell's total gross receipts from such sales; Shell contends that the tax can be based only upon that portion of such gross receipts attributable to its selling activities within the City.

## I

Preliminarily we set forth certain provisions of the Los Angeles Municipal Code applicable to the assessment here involved and a tax ruling of the City interpreting them. We also refer to pertinent decisions of this court relating to the code provisions.

L.A.M.C. section 21.03, subdivision (a), provided: "(a) Subject to the provisions of this Article, a business tax registration certificate must be obtained and a business tax must be paid by every person engaged in any of the businesses or occupations specified in Sections 21.50 to 21.198, inclusive, of this Article; and a business tax is hereby imposed in the amount prescribed in the applicable section. No person shall engage in any business or occupation subject to tax under the provisions of this Article without obtaining a registration certificate and paying the tax required thereunder."

L.A.M.C. section 21.166 provided: "(a) Every person *manufacturing and selling* any goods, wares or merchandise at *wholesale,* or *selling* any goods, wares or merchandise at *wholesale,* and not otherwise specifically taxed by other provisions of this Article,[2] shall pay for each calendar year or portion thereof the sum of $8.00 for the first $20,000 or less of gross receipts, and, in addition thereto, the sum of 40 cents per year for each additional $1,000 of gross receipts or fractional part thereof in excess of $20,000; . . . (b) For the purpose of this section, a wholesale sale or sale at wholesale means a sale of goods, wares or merchandise for the

---

[2]Apparently section 21.166 is a "catch-all" provision. Other sections of the article are directed to specific kinds of businesses. (See *City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823, 828 [271 P.2d 5].)

purpose of resale in the regular course of business." (Italics added.) Effective January 1, 1960, the rate of tax was increased.

In 1954 and 1957 this court held in the *Belridge* cases (*City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823 [271 P.2d 5], and (1957) 48 Cal.2d 320 [309 P.2d 417]) that although the City could constitutionally measure its business tax as to persons engaged in "selling" by reference to gross receipts arising from transactions having certain "extraterritorial elements," only those gross receipts which were "directly attributable" to selling activities within the City could constitutionally be utilized for this purpose.

In those cases the products sold never entered the territorial limits of the City, but the main office of the defendant company was located in Los Angeles and substantial elements of its sales activity took place there. (See 42 Cal.2d at pp. 825-826.) It was argued on the first appeal that the City could not constitutionally base its business tax upon the gross receipts of the company because to do so would be to impose a tax on business carried on outside the City, but we concluded that the tax was based on the activity of "selling" within the City and that there was "no [constitutional] objection to basing the rate of such tax on the gross receipts attributable to such selling activities, even though various extraterritorial events contribute to such gross receipts." (42 Cal.2d at p. 831.)

However, we went on to express an important corollary to this principle: "[E]ven though the city can tax the activity of selling it can only base the tax on such selling activities as are carried out within its territorial limits. For this reason it is only those gross receipts which are attributable to selling activities within the city which should form the basis for the rate of tax. Gross receipts attributable to selling activities conducted outside the city should not be included." (42 Cal.2d at pp. 831-832.) We pointed out that if the tax were to be based upon gross receipts attributable to selling activities outside the city, "it would unjustly discriminate against those firms whose selling activities in Los Angeles compose but a small fraction of the total sales effort and whose gross receipts are in large part attributable to selling activities in other areas." (42 Cal.2d at p. 832.) Thus, we concluded, "a just and reasonable construction [of the L.A.M.C. sections in question] requires that the measure of the tax be limited to those gross receipts attributable to selling activities within the city of Los Angeles." (42 Cal.2d at p. 833.)

On retrial the parties in *Belridge* were confronted with the problem of determining which of the company's gross receipts were in fact "attributable" to in-city selling activities within the meaning of our opinion. That the parties found this task a difficult one is manifested by the fact that

they finally entered into a stipulation providing in substance that *all* of the defendant company's gross receipts were attributable "in part" to its selling activities within the City and "in part" to its selling activities without the City, but that not more than 20 percent of its gross receipts were attributable to the defendant's selling activities within the City "under any method of allocation which is fairly calculated to determine the defendant's gross receipts derived from or attributable to sources within the City . . . and to determine the defendant's gross receipts derived from or attributable to sources outside the City. . . ." (*City of Los Angeles* v. *Belridge Oil Co., supra,* 48 Cal.2d 320, 321.) The stipulation also reserved the City's right to maintain on appeal "that there should be no allocation of receipts . . . and that the tax should be measured by defendant's total gross receipts." (48 Cal.2d at p. 322.) The trial court held in essence that the matter of "attribution" should be determined under a "fair" method of allocation such as that reflected in the stipulation of the parties and that therefore the tax should be based on 20 percent of total gross receipts.

On appeal the City pressed the argument which it had reserved in the stipulation, to wit, that the first *Belridge* decision did not require an allocation of defendant's gross receipts but permitted taxation based on total gross receipts. In our opinion we pointed out that this argument misinterpreted the principle of the first *Belridge* decision by failing to give sufficient consideration to that aspect of the principle represented by what we have termed the "corollary" thereto. In essence we reiterated that although a tax upon a "selling" business may be measured by reference to gross receipts derived from transactions having "extraterritorial elements," only those gross receipts "attributable" to in-city selling activities could be considered. We concluded: "Having heretofore held that only that portion of the gross receipts directly[3] attributable to defendant's selling activities carried on in the city of Los Angeles may be taxed under section 21.166, and the parties having stipulated that by a method of allocation 'fairly calculated to determine the defendant's gross receipts' 20 percent thereof was derived from selling activities in the city of Los Angeles, we conclude that the trial court was correct in applying the tax formula to 20 percent of defendant's gross receipts." (48 Cal.2d at p. 324.)

Following the *Belridge* decisions the city clerk, pursuant to authority granted him in the municipal code,[4] adopted Ruling 14. Part I of the

---

[3]The adverb "directly" was added to the standard in the second *Belridge* decision.

[4]L.A.M.C. section 21.15, subdivision (h), provides in relevant part: "When, by reason of the provisions of the Constitution of the United States or the Constitution of California, the business tax imposed by this Article cannot be enforced without there being an *apportionment* according to the amount of business done in the City of Los Angeles, or in the State of California, as the case may be, the City Clerk may

ruling, which set forth substantive guidelines for the determination of "direct attribution" within the meaning of the *Belridge* cases, will be discussed below. Part II of the ruling undertakes to give reasons why the adopted guidelines had been considered necessary or appropriate. Here it was stated that the ruling was promulgated by reason of the *Belridge* decisions, "which have made it necessary to devise a method by which the measure of the tax imposed upon persons who are engaged in certain taxable businesses both within and outside of the City of Los Angeles can be determined." It is also explained that the formula prescribed in the ruling was selected with a view toward providing a simple means of apportionment which would eliminate difficulties such as assigning weight to various factors and maintaining the kind of records necessary to the application of more complex formulae.

The keynote of the substantive portion of the ruling is struck in the first paragraph of Part I: "Whenever a person is engaged within the City of Los Angeles in a business subject to a tax under Sections 21.166 or 21.167, L.A.M.C., only those gross receipts which are *directly attributable* to the business engaged in within the City of Los Angeles shall be included within the measure of the tax." (Italics added.) The remainder of Part I goes on to describe what gross receipts should and should not be considered "directly attributable" to local activities and to provide procedures and practices to be followed in making the determination. Two paragraphs are particularly relevant for our present purposes.

Paragraph 1(c) of the ruling provides: "(c) If the person engaged in such business owns, leases, occupies or otherwise maintains within the City a place or premises upon which or from which he engages in such business, all receipts resulting from sales of goods, wares or merchandise which *are in any manner attributable to business functions carried on, at, or from that place of business,* and which goods, wares or merchandise *are either sold for shipment into the City of Los Angeles to the purchaser or his agent or designee, or are shipped from a place within the City of Los Angeles to a place within the City, or from a place within the City to a place outside the City but within the State of California,* shall be considered directly attributable to the business engaged in within the City." (Italics added.)

Paragraph 1(d), on the other hand, provides in substance that if such a person having such a place of business within the City has receipts attributable "both to business activities based upon that place of business and business activities carried on outside the City of Los Angeles" 25

---

make such rules and regulations for the *apportionment* of the tax as are necessary or desirable to overcome the constitutional objections." (Italics added.)

percent of the receipts resulting from the sale of goods *which are not shipped from or into the City* as provided in paragraph 1(c) shall be considered directly attributable if four or more of seven specifically listed elements of the selling process take place within the City, and 15 percent of the gross receipts so derived shall be considered directly attributable if less than four of the said elements take place within the City. The seven elements are, generally speaking: negotiating or soliciting, display of samples, processing of orders, acceptance of orders, arranging for delivery, billing and collection.[5]

---

[5]Paragraph 1(d) provides in full as follows: "(d) If the person engaged in such business owns, leases, occupies or otherwise maintains within the City of Los Angeles a place or premises upon which or from which he engages in business and has receipts which are attributable both to business activities based upon that place of business and business activities carried on outside the City of Los Angeles, 25 percent of the receipts resulting from the sale of goods, wares or merchandise manufactured and sold or sold by the person which are not shipped from or into the City of Los Angeles as provided in paragraph (c) above, shall be considered directly attributable if four or more of the elements of the selling process listed below take place within the City of Los Angeles with respect to the sales of goods, wares or merchandise which produce those receipts; if less than four of the listed elements of the selling process take place within the City, 15 percent of the gross receipts so derived shall be considered directly attributable.

"For the purpose of determining the amount of attributable gross receipts which shall be considered directly attributable for the purposes of this paragraph (d), the following elements of the selling process shall be considered:

"1. Negotiating sales of, or soliciting, receiving or taking orders for the sale of goods, wares or merchandise, and/or carrying on activities by an employee, agent, or otherwise, designed to promote, stimulate or otherwise encourage the sale of goods, wares or merchandise.

"2. Display of articles or samples of goods, wares or merchandise of like or similar kind to those offered for sale where the actual articles sold or to be sold will be delivered from a place of storage or manufacture located outside the City of Los Angeles but within the State of California.

"3. Processing of orders received or taken preparatory to their being accepted, where the actual acceptance occurs elsewhere.

"4. Approval or acceptance of orders received or taken.

"5. Giving an order for or arranging for delivery or shipment of articles sold or to be sold from a place of storage or manufacture located outside the City of Los Angeles but within the State of California.

"6. Billing for goods, wares or merchandise sold.

"7. Receiving or collecting receipts (as defined in subparagraph (a) in Section 21.00) resulting from sales of goods, wares or merchandise.

"It is recognized that many persons carrying on the business of selling goods, wares, or merchandise will not have their functions so organized that all of the elements of the selling process listed will be present; it is further recognized that certain of the elements listed may occur simultaneously, or nearly so, with other elements in all or a portion of the transactions of sale handled by a particular person. Notwithstanding, each of the elements present shall be considered as a separate element for the purposes of the regulation.

"It shall be recognized that certain businesses are subdivided into divisions or organized along functional lines for the convenience of administration and management

In the case of *Carnation Co.* v. *City of Los Angeles* (1966) 65 Cal.2d 36 [52 Cal.Rptr. 225, 416 P.2d 129], we considered one specific application of Ruling 14 in the light of the *Belridge* decisions. In that case, "administrative and manufacturing, processing or handling facilities for all products" whose gross receipts were in issue were located on the taxpayer Carnation's Los Angeles premises,[6] and "sales [of such products] at wholesale and retail [were] made both within and without the city limits." (65 Cal.2d at p. 38.) The City, relying on Ruling 14 (Part I, par. 1(c)), sought to base its business tax on "gross receipts from the sale of such products without regard to the place of sale if within the State of California." (65 Cal.2d at p. 38.) Carnation contended that this was forbidden by the *Belridge* cases and that the tax could be based only on sales to in-city customers; the trial court agreed.

We reversed the judgment. We noted first "that it is constitutional for a city to tax the privilege of manufacturing, processing or handling goods within its boundaries, and to determine the amount of the tax on the gross receipts from sales of the goods, regardless of whether the sales are made within or without the boundaries. (*American Mfg. Co.* v. *St. Louis,* 250 U.S. 459. . . .)" (65 Cal.2d at p. 38.) Then, stating that the question at issue was whether the tax sought to be levied in the case before us was of this nature (i.e., a tax upon "the privilege of manufacturing, processing or handling goods"), we proceeded to explain why the *Belridge* cases did not compel a negative answer to that question. *Belridge,* we pointed out, did not involve goods manufactured in Los Angeles—and in fact none of the goods there in question ever entered the City. Thus, we reasoned, the basis for the tax upon Belridge's business privilege was constitutionally limited to the extent of its *selling activities* within the City, whereas in *Carnation* the activity of *manufacturing* provided contact with all subsequent sales, wherever made within the state, and provided adequate consti-

---

and that it is to be expected in some cases that the operations of a particular division or functional unit of a taxpayer may call for the application of the 25 percent rate, and the operations of another may call for the application of the 15 percent rate. Due regard for such divisional or functional organization shall be made in administering the business tax ordinance under the provisions of this ruling."

[6]The City refers us to the record and briefs in *Carnation* and invites us to conclude therefrom that in fact a number of the products there involved were not manufactured within the City but were only "processed and handled" there prior to sale. On this basis the City urges that our *Carnation* decision is of broader application than our opinion indicates. We decline this invitation to reexamine the record in *Carnation* and alter the scope of our holding therein. Although such a procedure does not lack weighty precedent (see *Bingham* v. *United States* (1935) 296 U.S. 211, 218-219 [80 L.Ed. 160, 163-164, 56 S.Ct. 180]), we believe that the interests of sound judicial administration counsel against the alteration of a final opinion of this court by such a means.

tutional support for the measurement of the privilege tax on the basis of *all* gross receipts derived from such sales. (*65 Cal.2d at pp. 39-40.*)

## II

It is manifest that the roots of our *Belridge* decisions can be traced to the numerous and varied cases wherein the United States Supreme Court has insisted—on various doctrinal bases—that state taxes on interstate enterprises be fairly apportioned in order to prevent multiple tax burdens on such enterprises. Thus in cases involving state net income taxes on interstate businesses the high court, grounding its decision upon the due process clause, has struck down taxes which seek to "reach profits which are in no just sense attributable to transactions within [the taxing] jurisdiction" and therefore operate "unreasonably and arbitrarily, in attributing to [the taxing jurisdiction] a percentage of income out of all appropriate proportion to the business transacted" in that jurisdiction. (*Hans Rees' Sons* v. *North Carolina* (1931) 283 U.S. 123, 134, 135 [75 L.Ed. 879, 906, 908, 51 S.Ct. 385]; see also, e.g., *Butler Bros.* v. *McColgan* (1942) 315 U.S. 501, 506-507 [86 L.Ed. 991, 995-996, 62 S.Ct. 701].)

Similarly in cases involving state ad valorem property taxes on instrumentalities used in interstate commerce the court has required, on grounds of the due process and commerce clauses, that the tax be apportioned as to property which may be similarly taxed in other states. "Otherwise there would be multiple taxation of interstate operations and the tax would have no relation to the opportunities, benefits, or protection which the taxing state gives those operations." (*Standard Oil Co.* v. *Peck* (1952) 342 U.S. 382, 385 [96 L.Ed. 427, 430, 72 S.Ct. 309, 26 A.L.R.2d 1371]; see also and compare *Central Railroad Co.* v. *Pennsylvania* (1962) 370 U.S. 607 [8 L.Ed.2d 720, 82 S.Ct. 1297].)

Again, in cases involving gross receipts taxes on interstate enterprises, the court has held that the commerce clause requires apportionment of the tax if the activities giving rise to the gross receipts occurred in more than one state. "The vice characteristic of those [gross receipts taxes] which have been held invalid is that they have placed on the commerce burdens of such a nature as to be capable, in point of substance, of being imposed . . . or added to . . . with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause it would bear cumulative burdens not imposed on local commerce." (*Western Live Stock* v. *Bureau of Revenue* (1938) 303 U.S. 250, 255-256 [82 L.Ed. 823, 828, 58 S.Ct. 546, 115 A.L.R. 944]; see also, e.g., *Gwin, White & Prince, Inc.* v. *Henneford* (1939) 305 U.S. 434 [83 L.Ed. 272, 59 S.Ct. 325]; *J. D. Adams*

*Mfg. Co.* v. *Storen* (1938) 304 U.S. 307 [82 L.Ed. 1365, 58 S.Ct. 913, 117 A.L.R. 429]; but see *General Motors* v. *Washington* (1964) 377 U.S. 436 [12 L.Ed.2d 430, 84 S.Ct. 1564].)

Although the Constitution of this state, unlike that of the United States, contains no provision specifically preventing its constituent political subdivisions from enacting laws affecting commerce among them, there is no doubt that many of the considerations relevant to problems of interstate commerce apply in microcosm to the problems of intrastate or intercity commerce in a heavily populated state such as our own. In the words of one perceptive commentator: "The basic policy underlying the commerce clause of the Federal Constitution [art. 1, § 8, par. 3]—to preserve the free flow of commerce among the states to optimize economic benefits—is equally applicable to intercity commerce within the state. If fifty independent economic units within the United States are undesirable, 387 economic enclaves within California would be intolerable. A tax burden which places intercity commerce at a disadvantage in comparison to a wholly intracity business may have such an effect." (Sato, *Municipal Occupation Taxes in California: The Authority to Levy Taxes and the Burden on Intrastate Commerce* (1965) 53 Cal.L.Rev. 801, 818, fn. omitted.)

The decisions of this court in *City of Los Angeles* v. *Belridge Oil Co.*, *supra*—as well as a number of other decisions to which we shall presently advert—represent a recognition of these manifest realities and a determination that, in spite of the absence of a specific "commerce clause" in the state Constitution, certain other provisions of the state and federal Constitutions forbid municipal taxation which, by encouraging multiple burdens through the levy of unapportioned or improperly apportioned taxes on intercity business, operates to place such businesses at a competitive disadvantage.

One of the first cases to articulate this doctrine was *Ferran* v. *City of Palo Alto* (1942) 50 Cal.App.2d 374 [122 P.2d 965], a case upon which we relied in *Belridge*. There the city imposed a license tax on the business of laundering and taking orders for laundering—the tax being measured by "the number of employees at the plant or place of laundering." Plaintiff laundry maintained its plant, where 35 persons were employed, in San Francisco but had customers throughout the bay area, including Palo Alto, who were serviced by truck on a pick-up and delivery basis. Of a gross annual income amounting to approximately $60,000 only about $900 was derived from Palo Alto business, and plaintiff contended that the application of the license tax to it on the basis of its total number of employees was unconstitutional.

The Court of Appeal agreed. Noting that a license tax computed by *the amount of business done within the city* would be free from constitutional infirmity, and granting that the assessment of that amount might properly proceed by an indirect means looking to numbers of employees rather than dollar volume, the court nevertheless went on to hold the Palo Alto tax invalid as applied to plaintiff. Two separate constitutional grounds were stated. *First,* the court held that the tax had an improper extraterritorial application.[7] "Since the number of employees is in a general way proportionate to the amount of business done, and since in this case the total amount of business done is about $60,000 per annum, of which only about $900 per annum comes from within Palo Alto, it follows that the license tax is non-local and operates upon business outside of Palo Alto in proportion to the difference in amounts. It is an invalid attempt by the city to make its ordinance extraterritorial in scope and application. If the method were upheld, it would be possible to subvert the entire principle of local application of municipal revenue measures." (50 Cal.App.2d at pp. 382-383.) *Second,* the court held that the tax resulted in a denial of equal protection of the laws.[8] "We also hold that the case is governed by the principles laid down in *Buen[e]man v. Santa Barbara, supra* [(1937) 8 Cal.2d 405 [65 Cal.Rptr. 884, 109 A.L.R. 895]],[9] and related cases, and that . . . the ordinance is void as an unlawful and unreasonable discrimination against and denial of the equal protection of the law to laundries doing their laundering and having their plants outside of Palo

---

[7]Article XI, section 11, of the California Constitution provides: "Any county, city, town, or township may make and enforce *within its limits* all such . . . regulations as are not in conflict with general laws." (Italics added.) This provision has been held to forbid extraterritorial application of local ordinances. (*South Pasadena v. Los Angeles Terminal Ry. Co.* (1895) 109 Cal. 315, 321 [41 P. 1093].)

[8]The Fourteenth Amendment to the United States Constitution provides that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." The California Constitution contains no specific equal protection provision but it contains a number of provisions requiring the uniform application of laws. Article I, section 21, upon which the *Ferran* court appears to have placed reliance, in pertinent part provides: ". . . nor shall any citizen, or class of citizens, be granted privileges or immunities which, upon the same terms, shall not be granted to all other citizens." Article IV, section 16 provides: "A local or special statute is invalid in any case if a general statute can be made applicable." The test for determining the validity of a statute or ordinance against a claim of unlawful discrimination is substantially the same under these state prohibitions as it is under the equal protection clause. (*Whittaker v. Superior Court* (1968) 68 Cal.2d 357, 367. fn. 16 [66 Cal.Rptr. 710, 438 P.2d 358]; *County of L. A. v. Southern Cal. Tel. Co.* (1948) 32 Cal.2d 378, 389 [196 P.2d 773].)

[9]The *Bueneman* case involved a flat rate license fee upon businesses which solicited orders for laundry and maintained a pick-up and delivery system within the taxing city but had their plant located outside the city. Persons operating a similar business but having their plant within the city were not subject to the tax. This court held that the tax resulted in an invalid discrimination in favor of in-city laundries and was in violation of constitutional protections insuring equal protection of the laws.

Alto, but deriving some of their business from within said city. It also unlawfully discriminates against those engaged in Palo Alto in the business of taking orders for laundering or washing to be done by laundries maintaining their washing plants and doing their business outside the city. The business of such solicitors may be an independent calling having no logical connection whatsoever with the number of employees at the plant where the washing is done." (50 Cal.App.2d at p. 383.)

In *Security Truck Line* v. *City of Monterey* (1953) 117 Cal.App.2d 441 [256 P.2d 366, 257 P.2d 755], the principles announced in *Ferran* were clarified.[10] There the city sought to levy a business license tax upon highway carriers who hauled fish during canning season from points outside the city to canneries within the city—the tax being measured by the unladen weight of each vehicle used for this purpose. Plaintiff carrier had its principal place of business outside the city and had neither place of business nor agents nor terminus in the city, but during the autumn and winter canning season it engaged in the hauling of sardines from points in southern California to canneries within the city. Of plaintiff's sixty trucks no more than four were involved in fish hauls at any one time during the season, but its other commitments made it necessary to rotate the use of its trucks so that most of them were used for fish hauling at one time or another during the season; moreover, sometimes it was necessary for plaintiff to augment its own fleet of trucks by subcontracting with independent haulers who would haul fish only occasionally and sometimes only once a season. Prorated on a tonnage mile basis plaintiff's fish deliveries constituted only 1 percent of its total business, but during the season it derived 20 percent of its income from fish hauling.

The plaintiff carrier brought an action to have the tax declared unconstitutional and its enforcement enjoined. It urged that under the ordinance as applied it was required to pay a license fee as to each one of its vehicles used for fish hauling even if that particular vehicle hauled only one load of fish into the city during the season, and that, considering its necessary rotation of trucks, the ordinance would require it to license a substantial portion of its fleet plus the trucks of subcontracted haulers. Such a tax, plaintiff complained, was not reflected in the rate structure governing its compensation, and it urged that the ordinance was unconstitutional on several grounds—among them that of unlawful discrimination in violation of state and federal Constitutions. The trial court held that the ordinance was "unconstitutional in its application and wording" (117 Cal.App.2d at p. 449) and issued the injunction.

---

[10]The *Security Truck Line* case was not cited in either of our *Belridge* opinions. *Ferran*, as we have indicated above, was cited and relied upon in both *Belridge* opinions.

The Court of Appeal affirming the judgment, stated its approach to the problem in these terms: "If the tax here involved is imposed upon a taxable local event, that is, if the carrier is doing business in Monterey and if the measure of the tax is not discriminatory, then, in our opinion, the tax is valid. But if the tax is basically upon an event occurring outside the city, or, if the tax is discriminatory as to plaintiff, then it is invalid." (117 Cal. App.2d at p. 451.)[11]

Proceeding to apply this two-step standard the court first concluded that the plaintiff's activities in Monterey were sufficient from a due process standpoint to permit a tax upon them. "[S]uch activities constitute the doing of business in Monterey, a taxable event occurred there, and that city is empowered to tax such event by a proper nondiscriminatory ordinance." (117 Cal.App.2d at p. 452.) In reaching this conclusion the court rejected an argument of the plaintiff to the effect that *any* taxation of intercity carriers by particular municipalities was "unfair and unsound" on the basis that if each community served by a carrier could tax it an unfair burden on the carrier and on intercity business would result. This argument— which apparently sought to draw an analogy to those cases decided under the federal commerce clause which forbid a tax on the privilege of engaging in interstate commerce itself (see *Spector Motor Service* v. *O'Connor* (1951) 340 U.S. 602 [95 L.Ed. 573, 71 S.Ct. 508]; *Puget Sound Co.* v. *Tax Commission* (1937) 302 U.S. 90 [82 L.Ed. 68, 58 S.Ct. 72]; *Robbins* v. *Shelby Taxing District* (1887) 120 U.S. 489 [30 L.Ed. 694, 7 S.Ct. 592])—was held to lack any basis in state constitutional provisions.

However, when the court turned its attention to the validity of the particular tax at bench it recognized that the argument of multiple burdens, "while it does not result in a holding of lack of power to tax, does suggest that such tax ordinances must be scrutinized carefully to see that a city measures its tax by the taxable event that occurs in the city, and does not measure in such a manner that an unfair or discriminatory burden is imposed on such carriers." (117 Cal.App.2d at p. 453.) The tax before it, the court concluded, was measured in an invalid manner because the amount of tax was governed by a factor which had no relationship to the actual amount of business done in the taxing city. "The tax is imposed upon each truck making a delivery or deliveries during the fish hauling season. If that truck makes one hundred deliveries during the season, the maximum tax is but $13.50 for that truck. But if the carrier uses one hundred different trucks to make the one hundred deliveries, it must pay

---

[11]Illustrating the application of this test by reference to previous cases, the court stated that the tax in *Ferran* "was void as a denial of equal protection and because of discrimination against the outside business for failure of apportionment." (117 Cal. App.2d at p. 451.)

$13.50 for each truck, or a total of $1,350. . . . The taxable event in both cases is the same—the delivery of one hundred loads of fish in Monterey—yet one company would pay one hundred times what the other had to pay. It seems clear that the measure of the tax set forth in the ordinance has no reasonable connection with that taxable event. . . . [The tax] is based upon an arbitrary standard and a purely extraneous event." (117 Cal.App.2d at pp. 453-454.)

Finally, the court pointed out that the tax struck down in the *Ferran* case shared the constitutional defect which rendered the Monterey tax invalid. "In the *Ferran* case the tax was measured by a purely extraneous event [i.e., the number of employees at the San Francisco plant] that had no relation to the quantum or nature of the business done in Palo Alto. That is equally true in the instant case. Here, the standard selected, the number of individual trucks making deliveries, rather than the number of such deliveries or the tonnage carried into the city is a purely accidental and extraneous event that has no relation to the taxable event occurring in Monterey or the quantum of business there carried on. For these reasons, it is our opinion that the measure . . . is capricious, arbitrary and discriminatory." (117 Cal.App.2d at p. 454.)

In *City of Los Angeles* v. *Carson* (1960) 181 Cal.App.2d 540 [5 Cal. Rptr. 356], *City of Los Angeles* v. *Drake* (1961) 195 Cal.App.2d 744 [16 Cal.Rptr. 103], and *City of Los Angeles* v. *California Motor Transport Co.* (1961) 195 Cal.App.2d 759 [15 Cal.Rptr. 917], the *Security Truck Line* case was relied upon to hold invalid business license taxes on charter bus and motor transport businesses based upon the number of vehicles utilized. To be contrasted with these cases is *Willingham Bus Lines, Inc.* v. *Municipal Court* (1967) 66 Cal.2d 893 [59 Cal.Rptr. 618, 428 P.2d 602], where the city imposed a business license tax amounting to " '2% of the gross receipts attributable to the portion of the trip traveled within the city limits . . . by charter vehicles.' " We there said that "This method of allocation obviously works to confine the tax to that part of a licensee's revenue which is derived from intra-city business" (66 Cal.2d at p. 896), to which we added in a footnote: "In so doing, it avoids discrimination against multi-city enterprise since it minimizes the risk of multiple taxation. (Cf., e.g., *City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823, 832 [271 P.2d 5], app. dism. (1955) 348 U.S. 907 [99 L.Ed. 711, 75 S.Ct. 292]; *Security Truck Line* v. *City of Monterey* (1953) 117 Cal.App.2d 441, 451-454 [256 P.2d 366, 257 P.2d 755], and cases there discussed.)" (66 Cal.2d at p. 896, fn. 6.)

The foregoing review of the constellation of cases to which the *Belridge* decisions belong enables us to state with some confidence the

principles which support and inform those decisions. In the first place, it is clear that in spite of the absence of a specific "commerce clause" in our state Constitution, other provisions in that Constitution—notably those provisions forbidding extraterritorial application of laws and guaranteeing equal protection of the laws (see fns. 7 and 8, *ante*)—combine with the equal protection clause of the federal Constitution to proscribe local taxes which operate to unfairly discriminate against intercity businesses by subjecting such businesses to a measure of taxation which is not fairly apportioned to the quantum of business actually done in the taxing jurisdiction. ■ On the other hand, those constitutional principles do not *prohibit* local license taxes upon businesses "doing business" both within and outside the taxing jurisdiction; as long as such taxes are apportioned in a manner by which the measure of tax fairly reflects that proportion of the taxed activity which is actually carried on within the taxing jurisdiction, no constitutional objection appears. ■ However, and conversely, no measure of apportionment can satisfy the constitutional standard if the measure of tax is made to depend upon a factor which bears no fair relationship to the proportion of the taxed activity actually taking place within the taxing jurisdiction.

We proceed to apply these principles to the case now before us.

### III

■ The taxpayer Shell concedes that it is engaged in the business of "selling . . . goods . . . at wholesale" in the City of Los Angeles within the meaning of L.A.M.C. section 21.166—and that it is therefore subject to a business tax under the provisions of L.A.M.C. section 21.03.[12] The tax sought to be imposed on Shell pursuant to these sections is resisted in only one respect: Shell contends that the tax exceeds the City's constitutional powers and is in violation of the taxpayer's constitutional rights insofar as it is based upon the *total* gross receipts derived by Shell from wholesale sales of gasoline delivered from a point within the City to retailers located outside the City. We agree with this contention.

Ruling 14, upon which the City bases its attempt to include all of the questioned gross receipts in the measure of Shell's tax, essentially sets up a rigid distinction between, on the one hand, receipts derived from sales of goods which *are* shipped from or into the City, and on the other hand, receipts derived from sales of goods which *are not* shipped from or into the City.[13] Paragraph 1(c) of the ruling, which deals with receipts in the

---

[12]The cited sections of L.A.M.C. are set forth in the text accompanying and immediately preceding footnote 2, *ante.*

[13]Ruling 14 is discussed and set forth in relevant part in the text following footnote 4, *ante.*

former category, provides that *all* receipts from sales of goods "which are *in any manner attributable*" (italics added) to in-city business functions and which *are* shipped from or into the City "shall be considered directly attributable to the business engaged in within the City"—and therefore shall be included in the measure of the tax.[14] In contrast, paragraph 1(d) of the ruling provides that if a taxpayer has receipts attributable to both in-city and out-of-city activities, and those receipts result from the sale of goods which *are not* shipped from or into the City, either 15 or 25 percent—according to the presence or absence in the City of certain specified elements of the selling process (see fn. 5, *ante*)—of those gross receipts shall be considered "directly attributable" and therefore properly included in the measure of the tax.[15] ■ Thus, under the ruling a taxpayer who has receipts "which are in any manner attributable" to in-city selling activities but which are also to some degree attributable to out-of-city selling activities will be taxed on 100 percent of those receipts if the goods whose sale produces them *are* shipped from or into the City, whereas he will be taxed on a maximum of 25 percent of those receipts if the goods *are not* shipped from or into the City.

Most significantly, the aforesaid results will flow from the ruling *regardless of the proportion of selling activity which takes place within the City.* If a particular receipt is "in any manner attributable" to in-city selling activities and if the goods are shipped from or into the City, the fact that a substantial portion of—or even the greater portion of—the selling activities which produced that receipt took place outside the City is of no moment: the entire receipt is included. On the other hand, *if the goods are not shipped from or into the City,* no more than 25 percent of the receipt is included in the tax base even if all but a small fraction of the selling activity which produced it takes place within the City.

We think it manifest that the apportionment formula set forth in Ruling 14 is capable of being applied in violation of the constitutional principles set forth in *Belridge* and the other cases we have discussed. That formula, to the extent that it places decisive importance upon the situs of the goods at the time of shipment or delivery, rests upon a "purely accidental and extraneous event that has no relation to the taxable event occurring in [the City] or the quantum of business there carried on." (*Security Truck Line* v. *City of Monterey, supra,* 117 Cal.App.2d 441, 454.) The "taxable event" here is the conduct of selling activities in the

[14]As we have explained above, our *Belridge* decisions held that receipts "directly attributable" to in-city activities were properly included within the measure of the tax.

[15]In *City of Los Angeles* v. *Moore Business Forms, Inc.* (1966) 247 Cal.App.2d 353 [55 Cal.Rptr. 820], an application of paragraph 1(d) was upheld against constitutional attack.

City by a business subject to taxation, and the formula of Ruling 14 depends on a factor which bears no rational relationship to the *proportion* of those activities which actually takes place within the City. To the extent that the ruling can be applied to include within the tax base the *total* gross receipts arising from sales which have resulted in part from any substantial out-of-city sales activity, it purports to reach gross receipts other than those "directly attributable to . . . selling activities carried on in the City" (*City of Los Angeles* v. *Belridge Oil Co., supra,* 48 Cal.2d 320, 324) and is in violation of constitutional provisions forbidding extraterritorial application of local taxes and insuring equal protection under the law. (See fns. 7, 8, *ante.*)

▮ It is clear, however, that a taxpayer who challenges an apportionment formula on constitutional grounds must show more than the possibility of erratic or unconstitutional application. "One who attacks a formula of apportionment carries a distinct burden of showing by 'clear and cogent evidence' that *it results* in extraterritorial values being taxed." (*Butler Bros.* v. *McColgan, supra,* 315 U.S. 501, 507 [86 L.Ed. 991, 996], italics added; see also *City of Los Angeles* v. *Moore Business Forms, Inc.* (1966) 247 Cal.App.2d 353, 362 [55 Cal.Rptr. 820].) ▮ In the context of this case the taxpayer Shell has the burden of showing by "clear and cogent evidence" that the City's application of Ruling 14 to its business actually operates to include within its tax base total and undivided gross receipts from sales resulting in part from substantial out-of-city sales activity.

Shell has sustained its burden. At trial it presented substantial amounts of evidence detailing the functions of the out-of-city district offices contributing to the wholesale sale of gasoline to out-of-city dealers.[16] This evidence showed in essence that the district offices have primary responsibility for obtaining station sites (subject to approval by division, regional, or headquarters offices), constructing stations on approved sites, locating dealers to operate the stations, and "servicing" dealers within the district. While we think the functions of the district office relating to the location and construction of new service stations are only indirectly related to the selling process, it is clear that certain functions performed in relation to setting up new dealers and "servicing" both new and old dealers are directly involved in that process. Thus, for example, the district office is responsible for binding dealers to purchase quotas through written sales agreements. Additionally, when a new dealership is created it is

---

[16]The trial court found as a fact that "the major part of the sales activity [relating to wholesale sales to out-of-city dealers] takes place in the City. . . ." The evidence which we now summarize is not inconsistent with this finding.

the district office which makes arrangements with the bulk terminal for the initial delivery and future supply of gasoline to the station. Payment problems concerning out-of-city dealers are also the responsibility of the district office.

In addition to the functions of the district offices which are directly involved in the sales process, certain other aspects of that process take place outside the city. The actual delivery of the product of course occurs at the out-of-city station. Billing also occurs at this point, the driver of the delivery truck preparing an invoice according to the metered volume of gasoline actually delivered and handing it to the dealer. Furthermore, in certain circumstances—i.e., when a dealer because of a poor payment record or credit rating is on a "currency" rather than remittance basis—actual collection is made on a C.O.D. basis at the time of delivery.

It is clear from the foregoing that substantial elements of Shell's overall sales process relating to out-of-city dealers take place outside the City.[17] However, the City, applying its Ruling 14, refuses to take cognizance of those out-of-city elements in the measure of its tax—and accordingly purports to tax the total gross receipts derived from the sales in question —solely because the goods are shipped from the City. Such an application of the ruling is violative of the constitutional principles we have discussed because it renders the measure of tax dependent on a factor (i.e., the situs of the goods upon shipment) which bears no relationship to the proportion of the taxed activity (i.e., the business of selling) which actually takes place within the taxing jurisdiction and, under the facts of this case, operates to reach gross receipts other than those which are "directly attributable to . . . selling activities carried on in the City." (*City of Los Angeles* v. *Belridge Oil Co., supra,* 48 Cal.2d 320, 324.)

Finally, we note our conclusion that the case of *Carnation Co.* v. *City of Los Angeles, supra,* 65 Cal.2d 36, whose legal effect in the instant context has been a subject of considerable argument among the parties, is, as Shell has maintained, not controlling in the determination of the instant case. *Carnation* holds that a business privilege tax levied on the

---

[17]We do not suggest that the out-of-city sales activities which we have mentioned are the only such activities which should be considered directly contributive to Shell's gross receipts. Nor do we evaluate the relative significance of the various factors. Such matters will be the proper concern of the trial court upon remand. We here determine only that if there are susbtantial out-of-city sales activities which directly contribute to the gross receipts sought to be made a basis of the tax, the measure of tax must apportion those gross receipts in a manner which fairly reflects the proportion of in-city to out-of-city activities. We express no present opinion as to which specific activities of Shell are to be considered sales activities for this purpose.

business of "manufacturing and selling" (as opposed to merely "selling") under the provisions of L.A.M.C. sections 21.166 and 21.167 is fundamentally a tax upon the privilege of manufacturing and that such a tax may constitutionally be based upon total gross receipts from sales, wherever made, of products wholly manufactured within the taxing jurisdiction.[18]

The judgment is reversed and the cause is remanded to the trial court with directions to set aside the findings of fact and conclusions of law; to determine a proper apportionment of defendant's gross receipts in conformity with the views herein expressed and, to that end, to receive such additional evidence as it may deem necessary or advisable; thereafter, having reexamined and redetermined all issues, to make and file findings of fact and conclusions of law in conformity with the views herein expressed; and to enter judgment accordingly.

Tobriner, Acting C. J., Peters, J., and Mosk, J., concurred.

**BURKE, J.,** Concurring—The holding of the opinion in this case, as I read it, is that insofar as concerns the gross receipts from sales of gasoline delivered from Shell's in-city bulk terminal to locations outside the city, the city may not constitutionally assign as the controlling factor in fixing the measure of its tax on the business of "selling," the element of delivery from in the city to out of the city when substantial elements of the sales process to the out-of-city customers actually take place outside the city. Instead, a fair apportionment must be made as between in-city and out-of-city activities contributive to those gross receipts.

Although I agree with that ruling, it also seems to me that storage in the bulk plant in the city and delivery from that plant to out-of-city points are plainly factors to be taken into account and accorded their fair weight in making the apportionment. Based on my understanding that nothing in the opinion precludes considering the storage and delivery factors, I concur.

It also appears appropriate to note that if the city's code provisions undertook to cover businesses engaged in "handling and selling"; "storage, handling and selling"; "assembling and selling"; or "processing and selling," as well as (insofar as concerns Shell) merely "selling," then

---

[18]Because the issue is not now before us we express no present opinion whether an apportionment of gross receipts is required in the case of products not *wholly* manufactured within the taxing jurisdiction.

we would have a case more closely analogous to *Carnation* (*Carnation Co.* v. *City of Los Angeles* (1966) 65 Cal.2d 36 [52 Cal.Rptr. 225, 416 P.2d 129]), in which the tax was levied on the business of "manufacturing and selling."

McComb, J., and Wood, J.,* concurred.

Respondent's petition for a rehearing was denied March 26, 1971.

---

*Assigned by the Acting Chairman of the Judicial Council.