[Civ. No. 48964. First Dist., Div. One. May 6, 1982.]

CITY OF SAN JOSE, Plaintiff and Respondent, v. RUTHROFF & ENGLEKIRK CONSULTING STRUCTURAL ENGINEERS, INC., Defendant and Appellant.

**COUNSEL**

Paul M. Guyer and Richard J. Meehan for Defendant and Appellant.

Robert J. Logan, City Attorney, and Robert R. Cimino, Senior Deputy City Attorney, for Plaintiff and Respondent.

**OPINION**

**ELKINGTON, J.**—An ordinance of the City of San Jose (San Jose), a charter city, provides among other things that: "Every person engaged in the City of San Jose, whether or not at a fixed place of business in such City [with an average number of employees in such business of five or less], in the business of: . . . (c) Any profession or semi-profession; or (d) Any other business or businesses; [with certain here inapplicable exceptions] shall pay to the City of San Jose . . . [a minimum] annual license.tax of thirty dollars ($30.00) per annum, . . ." The tax is levied for revenue, and not for regulatory, purposes.

Defendant and appellant Ruthroff & Englekirk Consulting Structural Engineers, Inc. (Ruthroff) is a professional engineering firm licensed

by the State of California (see Bus. & Prof. Code, § 6700 et seq.) as a civil and structural engineer. It maintains offices within, and pays business license taxes to, the cities of Los Angeles, Oakland, and Newport Beach.

A building complex was in the course of construction in San Jose, under direction of an architect whose business headquarters was in Los Angeles. Under a contract with the architect, Ruthroff, *in Oakland*, performed some structural engineering services for the San Jose project mainly under telephone direction from the architect in Los Angeles. The contract price was $5,500 based, apparently, upon 220 hours of Ruthroff's employees' time. During the course of the San Jose project's construction an engineer employee of Ruthroff visited the San Jose site to inspect the work progress five or six times, and he, or another, had accompanied the architect to answer any questions generated upon application for a permit from a San Jose "building official." The total time spent in San Jose during the course of the project by Ruthroff's employees was about 12 hours. All of the remaining work of Ruthroff was performed in Oakland.

San Jose levied the minimum license tax of $30 against Ruthroff under its ordinance, based upon Ruthroff's above-described business there during the taxable year. Ruthroff's protest in time led to a determination of the superior court that the tax was properly levied. We review that adjudication upon the superior court's certification under rule 63, California Rules of Court, that a transfer to this court appears necessary to secure uniformity of decision and to settle an important question of law.

*City of Los Angeles* v. *Shell Oil Co.* (1971) 4 Cal.3d 108 [93 Cal. Rptr. 1, 480 P.2d 953] (cert. den., 404 U.S. 831 [30 L.Ed.2d 61, 92 S.Ct. 73]) and *General Motors Corp.* v. *City of Los Angeles* (1971) 5 Cal.3d 229 [95 Cal.Rptr. 635, 486 P.2d 163] are beyond any doubt the state's leading authorities on the issue here presented. They will be deemed to have superseded inconsistent language, if any, of earlier cases. (In quoting from them the italics, generally, are ours.)

*City of Los Angeles* v. *Shell Oil Co.* addressed itself to the constitutional implications of *intercity* business license taxes. It was there stated: "Although the Constitution of this state, unlike that of the United States, contains no provision specifically preventing its constituent

political subdivisions from enacting laws affecting commerce among them, there is no doubt that many of the considerations relevant to problems of interstate commerce apply in microcosm to the problems of intrastate or intercity commerce in a heavily populated state such as our own. In the words of one perceptive commentator: 'The basic policy underlying the commerce clause of the Federal Constitution [art. I, § 8, par. 3]—to preserve the free flow of commerce among the states to optimize economic benefits—is equally applicable to intercity commerce within the state. *If fifty independent economic units within the United States are undesirable, 387 economic enclaves within California would be intolerable. A tax burden which places intercity commerce at a disadvantage in comparison to a wholly intracity business may have such an effect.'*" (4 Cal.3d, p. 119.) "[I]t is clear that in spite of the absence of a specific 'commerce clause' in our state Constitution, other provisions in that Constitution—notably those provisions forbidding extraterritorial application of laws and guaranteeing equal protection of the laws . . .—combine with the equal protection clause of the federal Constitution to proscribe local taxes which operate to unfairly discriminate against intercity businesses by subjecting such businesses to a measure of taxation which is not fairly apportioned to the quantum of business actually done in the taxing jurisdiction. On the other hand, those constitutional principles do not *prohibit* local license taxes upon businesses 'doing business' both within and outside the taxing jurisdiction; *as long as such taxes are apportioned in a manner by which the measure of tax fairly reflects that proportion of the taxed activity which is actually carried on within the taxing jurisdiction, no constitutional objection appears. However, and conversely, no measure of apportionment can satisfy the constitutional standard if the measure of tax is made to depend upon a factor which bears no fair relationship to the proportion of the taxed activity actually taking place within the taxing jurisdiction.*" (4 Cal.3d, p. 124.)

The *City of Los Angeles* v. *Shell Oil Co.* court then found invalid, a business license tax "'that has no relation to the taxable event occurring in [the City] or the quantum of business there carried on.'" (4 Cal.3d, p. 125.)

*General Motors Corp.* v. *City of Los Angeles* reiterated the teaching of *City of Los Angeles* v. *Shell Oil Co.* and emphasized that the city was constitutionally *"free [only] to tax the business presence within its jurisdiction by reference to the 'taxable events' occurring there"* (5

Cal.3d, p. 242), and that a business license tax *"must be apportioned in a manner which fairly reflects the proportion of in-city to out-of-city [business] activities"* (5 Cal.3d, p. 244).

In *City of Los Angeles* v. *Shell Oil Co.* and *General Motors Corp.* v. *City of Los Angeles*, the business license taxes involved, even after apportionment and as might well be supposed, represented very substantial sums. In the case here before us, we are concerned with a *minimum* business license tax of $30 per year. A question arises whether that relatively small yearly tax, unapportioned on the one hand as to business activity entirely within San Jose, and on the other, as to occasional intercity business transactions therein, meets the constitutional requirement explicated by *City of Los Angeles* v. *Shell Oil Co.*

On this issue we first note the holding of *General Motors Corp.* v. *City of Los Angeles*, that what is *proscribed* is "the *possibility* of duplicate taxation by another taxing jurisdiction based upon the same activity . . . ." (Italics added; 5 Cal.3d, p. 243.) And we consider *City of Los Angeles* v. *Shell Oil Co.*'s emphasized adoption of a legal commentator's conclusion that the *possibility* of unapportioned business license taxation by each of the "387 economic enclaves within California would be *intolerable.*" (Italics added; 4 Cal.3d, p. 119.)

It will be remembered that in the case at bench Ruthroff had benefited from about 12 hours of its employees' services in San Jose during the taxable year. An otherwise similarly situated employer, with an average of 5 employees doing business entirely in San Jose over the same period, would benefit from business generated by at least 7,500 hours of employment. Yet the San Jose business license tax of each employer would be the same $30. And intercity business employers such as Ruthroff, were such a tax valid as to them, would be exposed to the *possibility* of total statewide taxes of $11,610 (387 taxing entities x $30).

We find it to be of significance that the *City of Los Angeles* v. *Shell Oil Co.* court relied in large measure upon the earlier cases of *Ferran* v. *City of Palo Alto* (1942) 50 Cal.App.2d 374 [122 P.2d 965] (an intracity and intercity business license tax of $15 per quarter where employees were four or less) and *Security Truck Line* v. *City of Monterey* (1953) 117 Cal.App.2d 441, 447 [256 P.2d 366, 257 P.2d 755] (a yearly tax of $13.50 on each truck engaged in intracity or intercity deliver-

ies "even if [the intercity truck] transports but a single load into the city").

The *City of Los Angeles* v. *Shell Oil Co.* court stated: "One of the first cases to articulate this doctrine was *Ferran* v. *City of Palo Alto* (1942) 50 Cal.App.2d 374 [122 P.2d 965], . . . There the city imposed a license tax on the business of laundering and taking orders for laundering—the tax being measured by 'the number of employees at the plant or place of laundering.' Plaintiff laundry maintained its plant, where 35 persons were employed, in San Francisco but had customers throughout the bay area, including Palo Alto, who were serviced by truck on a pick-up and delivery basis. Of a gross annual income amounting to approximately $60,000 only about $900 was derived from Palo Alto business, and plaintiff contended that the application of the license tax to it on the basis of its total number of employees was unconstitutional. [¶] The Court of Appeal agreed [holding that] . . . 'the ordinance is void as an unlawful and unreasonable discrimination against and denial of the equal protection of the law to laundries doing their laundering and having their plants outside of Palo Alto, but deriving some of their business from within said city. It also unlawfully discriminates against those engaged in Palo Alto in the business of taking orders for laundering or washing to be done by laundries maintaining their washing plants and doing their business outside the city. The business of such solicitors may be an independent calling having no logical connection whatsoever with the number of employees at the plant where the washing is done.'" (4 Cal.3d, pp. 119-121.) Approving *Ferran* v. *City of Palo Alto*, the Supreme Court found no reason for exception on account of the size of the city's $15 quarterly license tax on intercity laundry pickups and deliveries.

The *City of Los Angeles* v. *Shell Oil Co.* court then stated: "In *Security Truck Line* v. *City of Monterey* (1953) 117 Cal.App.2d 441 [256 P.2d 366, 257 P.2d 755], the principles announced in *Ferran* were clarified. There the city sought to levy a business license tax upon highway carriers who hauled fish during canning season from points outside the city to canneries within the city—the tax being measured by the unladen weight of each vehicle used for this purpose. Plaintiff carrier had its principal place of business outside the city and had neither place of business nor agents nor terminus in the city, but during the autumn and winter canning season it engaged in the hauling of sardines from points in southern California to canneries within the city. Of plaintiff's sixty

trucks no more than four were involved in fish hauls at any one time during the season, but its other commitments made it necessary to rotate the use of its trucks so that most of them were used for fish hauling at one time or another during the season; moreover, sometimes it was necessary for plaintiff to augment its own fleet of trucks by subcontracting with independent haulers who would haul fish only occasionally and sometimes only once a season. Prorated on a tonnage mile basis plaintiff's fish deliveries constituted only 1 percent of its total business, but during the season it derived 20 percent of its income from fish hauling. [¶] The plaintiff carrier brought an action to have the tax declared unconstitutional and its enforcement enjoined. It urged that under the ordinance as applied it was required to pay a license fee as to each one of its vehicles used for fish hauling even if that particular vehicle hauled only one load of fish into the city during the season, and that, considering its necessary rotation of trucks, the ordinance would require it to license a substantial portion of its fleet plus the trucks of subcontracted haulers. Such a tax, plaintiff complained, was not reflected in the rate structure governing its compensation, and it urged that the ordinance was unconstitutional on several grounds—among them that of unlawful discrimination in violation of state and federal Constitutions. The trial court held that the ordinance was 'unconstitutional in its application and wording' (117 Cal.App.2d at p. 449) and issued the injunction." (4 Cal.3d, p. 121; fn. omitted.)

"The Court of Appeal affirming the judgment, stated [among other things, that:] The tax before it . . . was measured in an invalid manner because the amount of tax was governed by a factor which had no relationship to the actual amount of business done in the taxing city. 'The tax is imposed upon each truck making a delivery or deliveries during the fish hauling season. If that truck makes one hundred deliveries during the season, the maximum tax is but $13.50 for that truck. But if the carrier uses one hundred different trucks to make the one hundred deliveries, it must pay $13.50 for each truck, or a total of $1,350. . . . The taxable event in both cases is the same—the delivery of one hundred loads of fish in Monterey—yet one company would pay one hundred times what the other had to pay. It seems clear that the measure of the tax set forth in the ordinance has no reasonable connection with that taxable event. . . . [The tax] is based upon an arbitrary standard and a purely extraneous event.' . . . 'Here, the standard selected, the number of individual trucks making deliveries, rather than the number of such deliveries or the tonnage carried into the city is a purely accidental and

extraneous event that has no relation to the taxable event occurring in Monterey or the quantum of business there carried on. For these reasons, it is our opinion that the measure ... is capricious, arbitrary and discriminatory.'" (4 Cal.3d pp. 122-123.)

Again the Supreme Court, as had the Court of Appeal, made no exception to application of the above-stated principles because of the amount of the annual license tax of $13.50 per truck doing business in the city.

Even more recently, the case of *Brabant* v. *City of South Gate* (1977) 66 Cal.App.3d 764 [136 Cal.Rptr. 150] passed upon a similar issue. There the city had imposed a yearly business license tax of $50 and $10, respectively, upon real estate brokers and salesmen doing business in the taxing city regardless of their principal business location or the amount of business done in the city. The small but unapportioned taxes were found void as to both a real estate broker and a salesman, for, the court said: "As stated in *City of Los Angeles* v. *Shell Oil Co., supra*, 4 Cal.3d at page 119, 'provisions of the state and federal Constitutions forbid municipal taxation which, by encouraging multiple burdens through the levy of unapportioned or improperly apportioned taxes on intercity business, operates to place such businesses at a competitive disadvantage.'" (66 Cal.App.3d, p. 771.)

We accordingly conclude that the amount of the tax in situations such as that before us is of little, if any, legal significance. Such taxes tend to encourage unconstitutional multiple burdens of taxation on those engaged in intercity business within the state's many local jurisdictions.

The judgment of the superior court must be reversed.

We are cognizant of the practical cost problems often attending apportionment and collection of business license taxes where "the proportion of the taxed activity actually taking place within the taxing jurisdiction" (*City of Los Angeles* v. *Shell Oil Co., supra*, 4 Cal.3d 108, 124) is small. But in such cases it seems reasonable, and more consistent with the above-noted authorities, to treat the matter as de minimis, rather than "to unfairly discriminate against intercity businesses by subjecting such businesses to a measure of taxation which is not fairly

apportioned to the quantum of business actually done in the taxing jurisdiction." (*Id.*, p. 124.)

The judgment is reversed.

Racanelli, P. J., and Newsom, J., concurred.