790 P.2d 263

**CITY OF PRESCOTT, a municipal corporation, Plaintiff, Counterdefendant, Appellee, Cross–Appellant,**

v.

**TOWN OF CHINO VALLEY, a municipal corporation, Defendant, Counterclaimant, Appellant, Cross–Appellee.**

**No. 1 CA–CIV 9754.**

Court of Appeals of Arizona, Division 1, Department B.

Nov. 14, 1989.

Review Denied May 8, 1990.

Cross–Petition for Review Granted in Part and Denied in Part May 8, 1990.

Lewis & Roca by Tom Galbraith, Susan M. Freeman, Patrick Derdenger, Jessica J. Youle and Gale L. Garriott, Phoenix, for plaintiff, counterdefendant, appellee, cross-appellant.

Ajalat & Polley, P.C. by Terry L. Polley, Charles R. Ajalat and Richard J. Ayoob, Los Angeles, Cal., and Stan A. Lehman, Prescott, and Paul G. Ulrich, Phoenix, for defendant, counterclaimant, appellant, cross-appellee.

Brown & Bain, P.A. by David J. Bodney, Daniel C. Barr, Michael W. Patten, Phoenix, for amicus curiae First Amendment Coalition of Arizona.

RICHARD M. DAVIS, Judge Pro Tem.

This case involves a transaction privilege tax enacted by the Town of Chino Valley (Chino Valley) and imposed by it upon the operation of a water pipeline owned by the City of Prescott (Prescott). The trial court upheld the enactment and imposition of the tax. In its cross-appeal, which we will first consider, Prescott contends that (1) the trial court was without jurisdiction; (2) Chino Valley's tax was enacted in violation of the Open Meeting Law; (3) the tax is preempted by the Groundwater Management Act; (4) the tax as applied to Prescott was invalid as lacking sufficient nexus; (5) Prescott's pipeline was exempt from the tax; and (6) the tax was unconstitutional for lack of apportionment. In its appeal, Chino Valley contends that the trial court erred (1) in its determination that the Board of Tax Appeals should proceed to determine the recipient or a proper division of the taxes in question, and (2) in its decision denying Chino Valley's claim for attorney's fees. We affirm most of the trial court's rulings but conclude that the tax should be apportioned and remand for that purpose.

## CORE FACTS

For approximately 40 years, Prescott has drawn water from wells on land it owns in what became in 1970 the incorporated town of Chino Valley. In the years encompassed by this litigation, which was begun in 1985, over 90% of the water supply for Prescott and its environs served by Prescott's municipal water utility came from these wells in Chino Valley. The water is transported from Chino Valley to Prescott by a pipeline owned by Prescott. Approximately two miles of the 17-mile pipeline are in Chino Valley. There are also within Chino Valley extensive storage and pumping facilities, and pipeline operating equipment such as a surge arrestor. Prescott owns several noncontiguous parcels of land and buildings in Chino Valley, and it has a full-time employee who resides in Chino Valley and oversees its water operations there. Prescott also delivers water to a few Chino Valley residents.

As Prescott points out, its withdrawal and use of water from Chino Valley has been strongly opposed by the town, or elements therein. In *Town of Chino Valley v. City of Prescott*, 131 Ariz. 78, 638 P.2d 1324 (1981), *appeal dismissed*, 457 U.S. 1101, 102 S.Ct. 2897, 73 L.Ed.2d 1310 (1982), Chino Valley unsuccessfully sought

to enjoin Prescott's withdrawals. While that action was pending, the former groundwater laws were amended to restrict the kind of injunctive relief Chino Valley was seeking. Chino Valley challenged these amendments unsuccessfully in *Town of Chino Valley v. State Land Department,* 119 Ariz. 243, 580 P.2d 704 (1978). Related litigation included *Cherry v. Steiner,* 716 F.2d 687 (9th Cir.1983), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1719, 80 L.Ed.2d 190 (1984).

In the spring of 1982, members of the Chino Valley town council raised the idea of enacting a transaction privilege tax to increase revenues for improving roads and other purposes. The issue was presented and discussed at public meetings on April 14, April 21, and April 28, 1982. Some public support—or at least a lack of strong opposition—was indicated for such a measure. At another public meeting on May 13, 1982, the council voted to adopt a 1% "sales tax" and directed the town attorney, John Preston, to prepare the necessary ordinance.

At the invitation of the town council, representatives of the State Revenue Department attended the June 24, 1982 public meeting. While the minutes of the meeting do not reflect it, and many other subjects were discussed, the idea was advanced at the meeting that the proposed tax should apply to Prescott's water pipeline. At this or a subsequent time, town attorney Preston indicated that the task of drafting a tax ordinance that would effectively include a tax on the pipeline was beyond his expertise, and recommended that the council retain a California lawyer named Ajalat, who specialized in municipal taxation. At an executive session in November, 1982, the council authorized Preston to employ Ajalat, who is one of Chino Valley's counsel in this appeal.

The transaction privilege tax ordinance remained under consideration for many months. In November and December of 1982 and January and February of 1983, Preston brought questions or reports on the drafting of the ordinance to executive sessions of the council. These reports usually had particular reference to the Prescott pipeline. The public notices of each of these executive sessions, which were held during a closed portion of an open public session, did not refer to Prescott's pipeline. In each case, the basis for the executive session was simply stated to be "for legal counsel."

At a public meeting on May 26, 1983, there was a first public reading—actually a reading by reference—of the drafted transaction privilege tax ordinance. The second reading occurred at a public council meeting on June 9, 1983. A public session exclusively on the proposed ordinance was scheduled for June 21. Notice of this meeting, which included reference to the proposed transaction privilege tax, was published in the *Prescott Courier* on June 14. The third reading of the ordinance took place at a public council meeting on June 23, and the ordinance was passed on that date.

The ordinance as enacted can be characterized as a comprehensive tax code designed to raise revenues from a broad range of economic activities. There are many analogies to the state transaction privilege tax act, A.R.S. § 42-1301 *et seq.*, and to Prescott's subsequently enacted transaction privilege tax code, § 4-1-1 *et seq.* of the *Code of the City of Prescott.* Of these, only Chino Valley's code taxes the operation of a water pipeline. Chino Valley's code also taxes the operation of oil and gas pipelines. Besides Prescott, two corporations operating water pipelines in Chino Valley pay taxes to it pursuant to the taxing provision in question here, which reads as follows:

> "Section 3. *Imposition of Tax—Tax Schedule*
>
> "There is hereby levied and shall be collected by the tax collector for the purpose of raising revenue to be used in defraying the necessary expenses of the Town privilege taxes measured by the amounts or volume of business transacted by persons on account of their business activities, and in the amounts to be determined by the application of rates against values, gross proceeds of sales

or gross income, as the case may be, whether derived from residents of the Town or not, or whether derived from within the Town or from without, in accordance with the following schedule:

"A. *Percentage of Tax and Business Liable to Taxation.* An amount equal to one percent (1%) of the gross proceeds of sale or gross income from the business upon every person engaging in or continuing within the Town in the following businesses:

* * * * * *

"(3) Operating a pipe line for transporting oil, or natural or artificial gas, or water, through pipes or conduits from a point within the Town to another point in the Town or in the State."

In time, Chino Valley formally informed Prescott of its liability to pay the tax. Prescott refused to pay, and in 1985 it initiated the present litigation seeking a declaratory judgment that the tax was invalid. Chino Valley filed a counterclaim seeking adjudication of the tax's validity and collection of the tax.

During the skirmishes which followed, Chino Valley moved for partial summary judgment on Prescott's complaint on the grounds that Prescott had failed to pay the tax before asserting its challenge. *See, e.g., Smotkin v. Peterson,* 73 Ariz. 1, 236 P.2d 743 (1951). The trial court eventually granted this motion, but the minute entry was never reduced to judgment.

Pursuant to stipulation, Prescott subsequently paid taxes to Chino Valley in an agreed amount for the years 1983 through 1985. Just before present counsel began representing Prescott, the City asked for leave to file an amended complaint seeking substantially the same declaratory relief as its initial pleading. The leave sought was granted, again pursuant to stipulation.

The trial court ultimately upheld the imposition of Chino Valley's tax upon Prescott, rejecting several lines of challenge. The trial court did, however, sustain Prescott's last asserted argument—that the provisions of A.R.S. § 42-1452, which address the allocation of transaction privilege taxes between two or more levying municipalities—required reference of the case to the Board of Tax Appeals for resolution of the allocation issue advanced by Prescott. The trial court also denied, after twice considering the matter, Chino Valley's claim for attorney's fees.

We will allude to additional facts where necessary.

## JURISDICTION

Prescott's first argument is that the trial court was without jurisdiction to determine the validity of the tax because its original complaint was dismissed. Prescott urges the principle that the courts will not declare upon the validity of an enactment at the behest of the enacting authority, *Township of Whitehall v. Oswald,* 400 Pa. 65, 161 A.2d 348 (1960); *City of Mishawaka v. Mohney,* 156 Ind.App. 668, 297 N.E.2d 858 (1973), and the principle that the parties cannot by mere stipulation confer jurisdiction upon the court. *Leon v. Numkena,* 142 Ariz. 307, 689 P.2d 566 (App.1984).

These principles are alive and well, but they have no application here. Prescott's original complaint was never formally dismissed, and its amended complaint was before the court. The parties by their stipulation further refined and structured the litigation to expedite its course. There was clearly a justiciable controversy before the trial court.

Prescott also argues that the declaratory judgment proceeding was premature in that there was no final exhaustion of administrative remedies because the Chino Valley hearing officer who determined Prescott's liability to pay the tax did not expressly deny or reject or respond to the protest accompanying its payment. Such a rejection, however, was clearly implicit in the implemented stipulation of the parties in the litigation which was already underway. The cause was ripe.

We accordingly reject Prescott's jurisdictional arguments.

OPEN MEETING LAW

We have found the questions raised under the Open Meeting Law, A.R.S. § 38–431 through § 38–431.09, challenging. After close study, while we find ourselves in agreement with a number of the mediate positions advanced by Prescott, we conclude that it was not entitled to the nullification relief it sought under § 38–431.05. Our reasoning follows.

A. *"Legal Advice"*

Prescott first argues that formulating or "evaluating the best way to structure a sales tax on a neighboring municipality" is not a proper occasion for executive sessions. We agree with this position.

The basic subject discussed at the executive sessions was whether a transaction privilege tax could lawfully be imposed upon the operation of Prescott's pipeline. Chino Valley's argument that the executive sessions were proper rests upon a literal construction of § 38–431.03, subsection (A)(3), which authorizes an executive session for the purpose of "[d]iscussion or consultation for legal advice with the attorney or attorneys of the public body." The trial judge correctly rejected this construction of subsection (A)(3) in a legislative context.

Notwithstanding the other enumerated occasions for an executive session with counsel, e.g., the "litigation exception" of § 38–431.03(A)(4), we agree with an interpretation by the Attorney General that subsection (A)(3) is concerned with privileged or otherwise inherently confidential lawyer-client communications. *See Local Government Handbook,* published by the Attorney General (1988), § 4.5.5. Generally, executive sessions are permitted only when public discussion could harm the public's interest. *See People ex rel. Hopf v. Barger,* 30 Ill.App.3d 525, 536, 332 N.E.2d 649, 660 (1975), and *Mayor and Aldermen of City of Vicksburg v. Vicksburg Printing & Publishing Co.,* 434 So.2d 1333, 1339 (Miss.1983). Such is not the case where legal discussion is for legislative purposes. We cannot infer that a broad literal construction of § 38–431.03(A)(3) was intended, because if it were, it would have a clear tendency to thwart the explicit aims of the act.

We accordingly agree that one or more of the executive sessions were improper.

B. *"Legal Action"*

As its premise for seeking nullification, Prescott next argues that the Chino Valley town council improperly took "legal action" at the executive sessions. This is a more difficult question, and our conclusion is that Chino Valley has simply failed to counter Prescott's assertion in this litigation.

Since enactment of the Open Meeting Law in 1962, the term "legal action" has been statutorily defined in § 38–431 as follows:

> "Legal action" means a collective decision, commitment or promise made by a majority of the members of a public body pursuant to the constitution, their charter or bylaws or specified scope of appointment or authority, and the laws of this state.

In his Opinion No. 75–8, issued in 1975, the Arizona Attorney General concluded *inter alia* that a "consultation," or the acquisition of information in the decision-making process, also constituted "legal action." The Attorney General's conclusion, reported at 1975–1976 *Opinions and Report of the Attorney General,* page 58, is stated as follows:

> "Accordingly, it is our opinion that all discussions, deliberations, considerations or consultations among a majority of the members of a governing body regarding matters which may foreseeably require final action or a final decision of the governing body constitute "legal action" and must be conducted in an open meeting, unless an executive session is authorized."

In a case involving "deliberations" rather than consultation, this court generally adopted the Attorney General's view. *Valencia v. Cota,* 126 Ariz. 555, 556–557, 617 P.2d 63, 64–65 (App.1980).

The Attorney General's Opinion No. 75–8 is supported by legal authorities from other

jurisdictions, and our reluctance to more fully embrace it relates to our legislature's 1982 amendatory enactment of the nullification and ratification provisions of A.R.S. § 38-431.05(B), quoted *infra.* These might possibly be taken, in our view, to indicate a renewed adherence to the narrower, longstanding legislative definition of "legal action." The parties here have not addressed this question in their briefs.

We are spared the necessity of pronouncing upon the matter in this litigation because Chino Valley has in no way challenged Prescott's assertion that the town council's consultations with legal counsel constituted "legal action." We therefore take it as established for the purposes of this case that the executive session consultations were a species of "legal action."

C. *Nullification*

From this point Prescott moves to its ultimate contention, that the taxation of its pipeline must be nullified under § 38-431.05(A). This critical portion of the Open Meeting Law was last amended in 1982. A.R.S. § 38-431.05 reads in full as follows:

"§ 38-431.05. Meeting held in violation of article; business transacted null and void; ratification

A. All legal action transacted by any public body during a meeting held in violation of any provision of this article is null and void except as provided in subsection B.

B. A public body may ratify legal action taken in violation of this article in accordance with the following requirements:

1. Ratification shall take place at a public meeting within thirty days after discovery of the violation or after such discovery should have been made by the exercise of reasonable diligence.

2. The notice for the meeting shall include a description of the action to be ratified, a clear statement that the public body proposes to ratify a prior action and information on how the public may obtain a detailed written description of the action to be ratified.

3. The public body shall make available to the public a detailed written description of the action to be ratified and all deliberation, consultations and decisions by members of the public body that preceded and related to such action. The written description shall also be included as part of the minutes of the meeting at which ratification is taken.

4. The public body shall make available to the public the notice and detailed written description required by this section at least seventy-two hours in advance of the public meeting at which the ratification is taken."

Chino Valley's bottom-line response to Prescott's contention is that its council took no critical or ultimate "legal action" during the four controversial executive sessions; that the tax code and its constituent tax upon Prescott and others were duly enacted after three concededly proper readings of the code and a public session devoted to it in May and June, 1983; and that accordingly, by its clear terms and particularly the language "legal action transacted * * * *during a meeting* held in violation * * *," § 38-431.05(A) does not apply so as to nullify the tax (emphasis added). In other words, regardless of the violative executive sessions several months before, the ordinance was actually enacted in unchallenged open and public proceedings.

We find ourselves in agreement with Chino Valley. If all of the "legal action" at the executive sessions were nullified, the concededly proper and public enactment proceedings remain. We simply find no basis in § 38-431.05(A) for nullifying the enactment proceedings.

We must take the statute as it is written, as amended in 1982. So taking it, we gather that it was designed to provide for the heavy penalty of nullification only for ultimate "legal action," as statutorily defined, rather than for any other, lesser *genre* of "legal action," as indicated in Attorney General's Opinion No. 75-8. "Legal action" and "consultations" are clearly distinct in § 38-431.05. *See* § 38-431.05(B)(3).

Nor do we see in § 38-431.05 any indication of an attempt or intent to inject a

concept of "taint" or "contamination" which would infect a subsequently and properly taken "legal action" with invalidity on account of a violation occurring in an antecedent proceeding. *Cf.* in that regard *Valencia v. Cota,* 126 Ariz. 555, 617 P.2d 63 (App.1980) and *Cooper v. Arizona Western College Dist. Governing Bd.,* 125 Ariz. 463, 610 P.2d 465 (App.1980). Nullification as provided in § 38-431.05(A) is geared to business transacted at a particular "meeting," and in our view that term as defined in § 38-431 [1] refers to a single gathering on a given day lasting through adjournment, and not to a conglomeration of sessions upon a particular subject.

Prescott and the amicus curiae have argued persuasively that there was no burden upon Prescott to show that it was specifically "prejudiced," as opposed to "affected," by Chino Valley's violative conduct. *See* § 38-431.07(A). They have also argued, with less force in our view, that any Open Meeting Law violation, however "technical," mandates nullification. *Cf. Karol v. Board of Educ. Trustees,* 122 Ariz. 95, 593 P.2d 649 (1979), and Fossey and Roston, *Invalidation as a Remedy for Violation of Open Meeting Statutes: Is the Cure Worse than the Disease,* 20 U.S. L.F.Rev. 163 (1986). They have completely failed, however, to come closely to grips with the language in § 38-431.05(A) that Chino Valley has relied upon, and that we find determinative.

Prescott has cited the principle, stated in *Carefree Improvement Ass'n v. City of Scottsdale,* 133 Ariz. 106, 112, 649 P.2d 985, 991 (App.1982), that we must look at the "whole of the proceeding rather than its several parts." We agree with that statement in *Carefree,* but we do not consider that it authorizes us to rewrite the legislature's statute and award relief in the form of nullification where it has not been provided. In *Carefree,* there was a failure to place effective notices of a public meeting, thus voiding the annexation ordinance adapted at the improperly noticed meeting.

Nor do we believe that we can take the basic mandate of § 38-431.01(A),[2] and the terms of § 38-431.09 declaring the public policy and directing construction of the act,[3] and extrapolate from these a legislative intent broader than, and contrary to, that which we find clearly expressed in § 38-431.05. Resort is made to interpretational aids when the terms of the relevant statute fail to yield an answer. *State v. Sweet,* 143 Ariz. 266, 693 P.2d 921 (1985). The argument along these lines evokes the old saw, "Do as I say and not as I do." We must focus not only upon what the legislature has said in generality and directive but also upon what it has concretely provided in § 38-431.05. Section 38-431.05 deals with the subject of nullification and in our view it itself defines the limits of its application in respect to the question here.

D. *Notices of Executive Sessions*

Prescott also points out that the executive sessions were improperly noticed in that there was no general statement made as to their subject matter. *See* § 38-431.02(I) and 38-431.03(E). Prescott is again correct in this regard, but for the reasons discussed above, the subsequent public enactment proceedings are not vulnerable.[4]

1. "'Meeting' means the gathering of a quorum of members of a public body to propose or take legal action, including any deliberations with respect to such action."

2. "All meetings of any public body shall be public meetings and all persons so desiring shall be permitted to attend and listen to the deliberations and proceedings."

3. "It is the public policy of this state, reflected in this article, that meetings of public bodies be conducted openly and that notices and agendas be provided for such meetings which contain such information as is reasonably necessary to inform the public of the matters to be discussed or decided. Toward this end, any person or entity charged with the interpretations of this article shall take into account the policy of this article and shall construe any provision of this article in favor of open and public meetings."

4. Prescott cites *Cox Enterprises, Inc. v. Independent School District,* 706 S.W.2d 956 (Tex.1986), in this regard, but apart from the considerations discussed above, the Texas act required specificity in regard to the executive session agenda. Under our statute, only a general description of subject matter is required.

We accordingly reject Prescott's claim that the Chino Valley tax code or its provision applicable to Prescott should be voided for violations of the Open Meeting Law.

PREEMPTION

Prescott contends that Chino Valley's tax upon the operation of a water pipeline is preempted by the Groundwater Management Act, A.R.S. § 45–401 *et seq.* More specifically, Prescott contends that those provisions of the Groundwater Management Act that expressly authorize its withdrawal and transportation activities, A.R.S. § 45–492(A), fully occupy the field and leave no room for a tax such as Chino Valley's. Prescott also contends that Chino Valley's tax violates the prohibition in the Act against the assessment or imposition of "damages" for transporting groundwater within a sub-basin of an active management area. A.R.S. § 45–541(B). Both Prescott and Chino Valley are located within the Little Chino sub-basin of the Prescott Active Management Area.

We agree with Prescott that the Groundwater Management Act is markedly comprehensive legislation. *See* A.R.S. § 45–401(B) and *Cortaro Water Users Ass'n v. Steiner,* 148 Ariz. 343, 345, 714 P.2d 836, 838 (App.1985), *approved* 148 Ariz. 314, 714 P.2d 807 (1986). We also agree with the premise that our legislature could have chosen to prohibit taxation of a water pipeline system such as that owned by Prescott.

The principle of preemption is applied when a political subdivision creates law that is in conflict with the generally applicable law of the sovereign. The state's law must be of statewide concern, and the state's lawmakers must have intended to appropriate the field. *State v. Mercurio,* 153 Ariz. 336, 340, 736 P.2d 819, 823 (App.1987). The existence of a preempting policy must be clear. *Cf. Arizona Public Service Co. v. Town of Paradise Valley,* 125 Ariz. 447, 451, 610 P.2d 449, 453 (1980). Also, the assertedly competing provisions in question must be actually conflicting, rather than capable of peaceful coexistence. Mere commonality of some aspect of subject matter is insufficient:

> "The mere fact that state and local legislation touch upon a common element does not mean that one has preempted the other. For instance, in *Russo v. City of Tucson,* 20 Ariz.App. 401, 513 P.2d 690 (1973), the city of Tucson was permitted to impose an occupational tax on attorneys despite the fact that the state possessed the exclusive power to regulate and license persons entitled to practice law."

*State v. Jacobson,* 121 Ariz. 65, 70, 588 P.2d 358, 363 (App.1978) *overruled on other grounds,* 126 Ariz. 203, 613 P.2d 1259 (1980).

The tax at issue here is essentially a tax on business activities, or more precisely, upon the privilege of engaging in business. *See Univar Corp. v. City of Phoenix,* 122 Ariz. 220, 594 P.2d 86 (1979). The term "damages," employed in the Groundwater Management Act, generally refers to compensation for injury or impairment of supply. A.R.S. § 45–545(A); Doyles, *Transportation Provisions of Arizona's 1980 Groundwater Management Act,* 24 Ariz.L. Rev. 655 (1983). We see no reason to transmute this tax into "damages" as defined in the Act.

As comprehensive as the Groundwater Management Act is, we find nothing in it that preempts an otherwise appropriate, nondiscriminatory local privilege tax. In our opinion a tax like the present one was not out of the realm of the foreseeable, and if the legislature had been of a mind to preclude any such tax, we believe it would have done so in appropriate terms.

NEXUS

Prescott next argues that its operations in Chino Valley are insufficient to provide a "nexus" for taxation. Due process requires a substantial relationship between the taxed entity's activities and the taxing authority. *Miller Bros. Co. v. Maryland,* 347 U.S. 340, 74 S.Ct. 535, 98 L.Ed. 744 (1954); *Univar Corp. v. City of Phoenix,* 122 Ariz. 220, 594 P.2d 86 (1979); *City*

of *Phoenix v. West Publishing Co.*, 148 Ariz. 31, 712 P.2d 944 (App.1985) *cert. denied*, 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 573 (1986); *City of Tacoma v. Fiberchem, Inc.*, 44 Wash.App. 538, 722 P.2d 1357 (1986).

Prescott concedes that it can properly be taxed upon sales to customers residing in Chino Valley [5] and argues that this is the limit of its taxability. Prescott emphasizes that 98.7% of its sales of water are outside Chino Valley, and that its pipeline serves only the municipality's Prescott-based operations, that is, the pipeline is not for hire or use by others. Chino Valley, on the other hand, emphasizes the substantial nature of Prescott's operations in Chino Valley, and Prescott's need for the municipal services and highways that Chino Valley provides.

On this question of taxable nexus, Chino Valley clearly must prevail. Initially, we note that the definition of "business" in the Chino Valley ordinance is in pertinent aspects as broad as the definition in A.R.S. § 42–1301(1), which defines "business" for the purposes of the state transaction privilege tax.[6]

By all of the evidence, a major, integrated portion of Prescott's water supply system is located in Chino Valley and avails itself of the town's facilities and services. Prescott has not cited any authority for the proposition that it is immune from taxation merely because it does not lease or hire out its pipeline and generate revenues in that manner. Nor is any authority cited to the effect that Prescott's activities do not amount to "operation" of a pipeline. The pipeline is clearly an integral part of a transaction and revenue-producing enterprise. Although Prescott suggests a lack of any authority for such a tax, the incident taxed here (transportation) is not unlike the incident taxed in *Memphis Natural Gas Co. v. Stone*, 335 U.S. 80, 68 S.Ct. 1475, 92 L.Ed. 1832 (1948).

There is nothing intangible, ephemeral, or insubstantial about Prescott's business activities in Chino Valley, and in our view ample nexus exists.

EXEMPTION

Inasmuch as Prescott argues that its "qualification for Chino Valley's Section 4.K exemption demonstrates the lack of taxable nexus," we address the claim of exemption here. The trial court found that the exemption applied to the operation of Prescott's water pipeline, but it further found that Prescott was estopped from claiming the exemption by its failure to timely show the necessary factual basis for the exemption for the years in question. Apart from attempting to bolster its nexus argument, Prescott argues that it made the necessary timely factual showing to avoid estoppel.

In our opinion the trial court erred in concluding that Prescott was potentially exempt under the terms of the Chino Valley tax code.

The pertinent terms of the exemption provisions are as follows:

"Section 4. *Exemptions.*

The following shall not be subject to taxation under this article:

* * * * * *

"K. Sales of tangible personal property in which all of the following occur

5. Prescott implicitly recognizes the principle that a municipality operating a proprietary business is subject to taxation as in the case of any other business. *City of Phoenix v. Moore*, 57 Ariz. 350, 113 P.2d 935 (1941); *see also Town of Mulga v. Town of Maytown*, 502 So.2d 731 (Ala. 1987).

6. A.R.S. § 42–1301(1) provides:

"1. 'Business' includes all activities or acts, personal or corporate, engaged in or caused to be engaged in with the object of gain, benefit or advantage, either directly or indirectly, but not casual activities or sales."

The definition of "business" in the Chino Valley ordinance provides:

"C. 'Business' shall mean any business, commercial enterprise, trade, calling, or vocation, whether or not carried on for gain or profit. 'Business' includes such activities when performed by governmental entities such as the furnishing of water for commercial or domestic use, but does not include activities of governmental entities to the extent such activities are exclusively the performance of a governmental function, including fire and health protection and sanitation. 'Business' does not include casual activities or sales."

without the Town limits of the Town of Chino Valley.

(1) The placement of the order.

(2) The stock from which delivery was made.

(3) Transference of title and possession."

The term "stock" is defined in Section 1(X) of the ordinance to mean "the goods and wares of a person kept for sale and traffic * * *."

Exemptions from taxing provisions are narrowly construed. *See Ebasco Services, Inc. v. Arizona State Tax Commission,* 105 Ariz. 94, 99, 459 P.2d 719, 724 (1969). Here, we give no critical weight to the affidavit of certain Chino Valley town council members expressing their recollection of their intent. Rather, we look to the wording of the exemption ordinance, viewed in the context of the ordinance as a whole. *State v. Ball,* 157 Ariz. 382, 758 P.2d 653 (App.1988).

We do not hold that pipelineable commodities such as bulk liquids and gaseous substances could never be perceived for some purposes as "stock" or "goods and wares." Rather, we hold that upon a reading of this particular ordinance in its entirety, it is clear that these exempting provisions were not intended to be extended beyond their commonly accepted reference to items of inventory for sale.

## APPORTIONMENT

The next issue is whether Chino Valley's tax has been unconstitutionally applied to Prescott because it has not been apportioned, or reasonably apportioned. Prescott has convinced us that it has carried its burden of showing an unacceptable apportionment.

First, we allude to three additional factual aspects which fill out the picture on this issue and the Multi-Municipal Tax Act (§ 42-1452) issue that follows.

The first additional aspect has no present bearing on apportionment but should be mentioned. Prescott, through its municipally-owned water utility, imposes a 1% "sales tax" (transaction privilege tax) upon its sales of water, which it passes on to consumers. Chino Valley suggests in its briefs here that this tax by Prescott "upon itself" is improper, but the issue was not presented below and is not actually presented here. We therefore intimate no view on the legality of the Prescott tax.

The second additional fact, which is of immediate significance, is that after enactment of its tax, Chino Valley administratively determined that water gallonage pumped for consumption outside of Chino Valley would be taxed at only 80% of the full 1% of its retail sales value. Thus, while water delivered by Prescott to Chino Valley consumers (about 1.3% of the system's consumers) was taxed at the full 1% rate, the remaining water pumped was taxed at 0.8%.

The last fact is related to the immediately preceding. Although the measure of the Chino Valley tax is stated to be 1% of gross receipts, Chino Valley administratively determined that the tax payable by Prescott would be based upon the gallonage pumped by Prescott through the Chino Valley pipeline. This ruling had the effect of eliminating from the tax payable by Prescott tax on water it delivered to its consumers from other sources.

The principle of fair apportionment among multiple taxing authorities developed under federal law. For some of the history *see Exxon Corp. v. Department of Revenue,* 447 U.S. 207, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980); *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); and *Central Greyhound Lines v. Mealey,* 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633 (1948). A line of California decisions extended the principle to intrastate taxation, notwithstanding the lack of an analogue to the commerce clause. Most salient among these cases is *City of Los Angeles v. Shell Oil Co.,* 4 Cal.3d 108, 93 Cal.Rptr. 1, 480 P.2d 953, *cert. denied* 404 U.S. 831, 92 S.Ct. 73, 30 L.Ed.2d 61 (1971). Enlarging upon its previous holdings, the California court in *Shell Oil* stated at 93 Cal.Rptr. 11, 480 P.2d 963:

> "The foregoing review ... enables us to state with some confidence the princi-

ples which support and inform those decisions. In the first place, it is clear that in spite of the absence of a specific 'commerce clause' in our state Constitution, other provisions in that Constitution—notably those provisions forbidding extraterritorial application of laws and guaranteeing equal protection of the laws ... —combine with the equal protection clause of the federal Constitution to proscribe local taxes which operate to unfairly discriminate against intercity businesses by subjecting such businesses to a measure of taxation which is not fairly apportioned to the quantum of business actually done in the taxing jurisdiction. On the other hand, those constitutional principles do not *prohibit* local license taxes upon businesses 'doing business' both within and outside the taxing jurisdiction; as long as such taxes are apportioned in a manner by which the measure of tax fairly reflects that proportion of the taxed activity which is actually carried on within the taxing jurisdiction, no constitutional objection appears. However, and conversely, no measure of apportionment can satisfy the constitutional standard if the measure of tax is made to depend upon a factor which bears no fair relationship to the proportion of the taxed activity actually taking place within the taxing jurisdiction."

*Shell Oil*'s apportionment principle was recently considered in *Park 'n Fly of San Francisco, Inc. v. City of South San Francisco,* 188 Cal.App.3d 1201, 234 Cal. Rptr. 23 (1987). There, rejecting an apportionment argument, the full amount of the fee paid for off-airport parking was held taxable in spite of the substantial extraterritorial "free ride to the airport" feature. The court alluded to a number of principles which must be considered here:

> "'The taxpayer who challenges a method of apportionment of a local tax bears the burden of showing that extraterritorial values are being taxed.' (*Volkswagen Pacific, Inc. v. City of Los Angeles, supra,* 7 Cal.3d 48, 58, 101 Cal. Rptr. 869, 496 P.2d 1237). 'One who attacks a formula of apportionment carries a distinct burden of showing by 'clear and cogent evidence' that it *results* in extraterritorial values being taxed.' (*City of Los Angeles v. Shell Oil Co., supra,* 4 Cal.3d 108, 126, 93 Cal.Rptr. 1, 480 P.2d 953.)
>
> * * * * * *
>
> "Under *Shell Oil* and its progeny, a tax is invalid if it bears no relationship to the quantum of the taxable event actually transacted in the taxing city. (See *Volkswagen Pacific, Inc. v. City of Los Angeles, supra,* 7 Cal.3d 48, 58, 101 Cal. Rptr. 869, 496 P.2d 1237; *General Motors Corp. v. City of Los Angeles* (1971) 5 Cal.3d 229, 95 Cal.Rptr. 635, 486 P.2d 163; *City of San Jose v. Ruthroff & Englekirk etc. Engineers, Inc.* (1982) 131 Cal.App.3d 462, 468–469, 183 Cal.Rptr. 391; *Brabant v. City of South Gate* (1977) 66 Cal.App.3d 764, 771, 136 Cal. Rptr. 150.) The focus is upon the relationship between the taxable event or activity and the tax imposed. The objective of the apportionment rule is to avoid multiple taxation of a single transaction, which imposes an unconstitutional burden upon those engaged in intercity business. (*City of San Jose v. Ruthroff & Englekirk etc. Engineers, Inc., supra,* 131 Cal.App.3d at p. 469, 183 Cal.Rptr. 391; *Brabant v. City of South Gate, supra,* 66 Cal.App.3d at p. 771, 136 Cal. Rptr. 150.)" 188 Cal.App.3d at 1211, 234 Cal.Rptr. at 29–30.

Even though Prescott has not in its argument focused our attention on the Arizona Constitution, we believe the sense and equity of the apportionment principle, rooted as it is in due process and equal protection, speaks for itself. One municipality should not be permitted on the basis of fractional activity to reap an undue windfall at the expense of the taxpayer or another community. Chino Valley itself does not reject *the principle* of apportionment. We do not believe that rejection of the principle is indicated by any Arizona authority, including *Univar Corp. v. City of Phoenix,* 122 Ariz. 220, 594 P.2d 86 (1979), and the cases discussed therein. We accordingly adopt this sound principle pursuant to Article 2, Sections 4 (Due Pro-

cess) and 13 (equal privileges or immunity) of the Arizona Constitution.

Chino Valley advances various arguments that apportionment should not be applied here. First, Chino Valley points to testimony that "the whole business" is in Chino Valley. What this testimony means is unclear to us, because the record plainly indicates that approximately 15 miles of the 17 mile pipeline lie outside of Chino Valley, as do most of the water customers. It is thus clear to us that, however the relevant "business" or "transaction" is defined, a very substantial part of it is external to Chino Valley.

Chino Valley argues in effect that the extraction and pipelining of water is similar to the completed process of manufacturing held fully taxable at the manufacturing site in *American Manufacturing Co. v. St. Louis,* 250 U.S. 459, 39 S.Ct. 522, 63 L.Ed. 1084 (1919). *See also Carnation Co. v. Los Angeles,* 65 Cal.2d 36, 52 Cal.Rptr. 225, 416 P.2d 129 (1966), and *State Tax Commission v. Wallapai Brick and Clay Products,* 85 Ariz. 23, 330 P.2d 988 (1958).

We cannot agree. First, we think a tax directed at the extraction of water *would* violate the Groundwater Management Act. See the discussion under "Preemption," above. Secondly, it is obvious that the transporting or pipelining process is a continuous one, ending far down the line from Chino Valley. It is also abundantly clear on a common sense and holistic view of the system that Chino Valley is necessarily taxing values created by extraterritorial activity. The Prescott water delivery system is a utility, and the rates charged by a utility normally and logically reflect the acquisition and maintenance costs of the entire system. It is established here that most of that system, including its administrative apparatus, is external to Chino Valley.

Chino Valley argues that any logical measure for the tax is acceptable and that the taxing authority is accorded broad discretion in setting the measure. *See Commonwealth Edison Corp. v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). The general principles are sound but what we have said, in the context of the *Shell Oil* principles, answers the argument.

Lastly, Chino Valley argues that its administrative decisions to tax water consumed extraterritorially at only 80% of the full rate and to tax only the gallonage pumped through the pipeline in Chino Valley accommodates any required apportionment. Again, we cannot agree. While the facilities in Chino Valley are substantial, those outside Chino Valley appear to be far too great to be met by the 20% discount factor.

Prescott argues that because the Chino Valley tax is misapportioned, it is void. *Shell Oil* upon which Prescott most heavily relies directed court-determined apportionment. Prescott cites no authority voiding a measure such as this one, measured by increment of volume and not void upon its face. We think the *Shell* result of apportionment should follow in this case.

The Chino Valley tax is levied for "operating a pipe line for transporting ... water * * *". It is clear that Prescott operates a pipeline within Chino Valley, and also outside of Chino Valley. It is not altogether clear to us that all of Prescott's water distribution activities outside of Chino Valley involve "operating a pipe line for transporting water" as that term may be reasonably defined. Chino Valley may only levy against taxable events, as defined. It is at least conceivable that the principle that taxable and nontaxable activities can be segregated may be applicable to the situation before us. *See Ebasco Services Incorporated v. Arizona State Tax Commission,* 105 Ariz. 94, 459 P.2d 719 (1969); *State Tax Commission of Arizona v. Holmes & Narver, Inc.,* 113 Ariz. 165, 548 P.2d 1162 (1976). The parties have not touched upon this subject in their briefing and we therefore say nothing further on it here. On remand the burden will be upon Prescott to show the proper extent of its benefit from apportionment.

### *A.R.S. § 42-1452*

This brings us to § 42-1452, the Multi-Municipal Tax Act. Pertinent sub-

sections A, B and D of this law, enacted in 1984, read as follows:

A. Except as otherwise provided in this section, a taxpayer who has paid transaction privilege taxes on a transaction to an appropriate city or town, or qualified for an exemption from transaction privilege taxes under the ordinance of an appropriate city or town, is not required to pay transaction privilege taxes on the same transaction to any other city or town.

B. If a city or town asserts, in whole or in part, the right to a tax which was paid to an appropriate city or town, the cities and towns claiming the tax shall attempt to resolve allocation of the tax among themselves. Except as otherwise provided in this section, the taxpayer shall not be a party to the dispute but may be compelled to give evidence or produce books and records.

* * * * * *

D. If the cities or towns involved cannot resolve the dispute arising under subsection B or C, any city or town which is a party to the dispute may submit the issue to the state board of tax appeals for resolution. The taxpayer may intervene in any proceeding before the state board to assist in resolving the dispute. The state board shall determine which city or town has the superior jurisdictional claim, based upon their respective ordinances and common law principles related to transaction privilege taxation, and, if the taxpayer paid tax on the transaction, shall award the entire tax to the prevailing city or town.

An "appropriate city or town" is defined in subsection I of the statute and would include Prescott as an appropriate recipient of its own self-imposed tax.

Prescott asserted the applicability of § 42–1452 in the later stages of the litigation in the trial court and the trial judge held it applicable. Chino Valley disputes the availability of § 42–1452 to Prescott on procedural grounds, but more fundamentally, it contends that the statute does not apply here because two different transactions, or more precisely two different privileges, are involved. We find ourselves in agreement with what we take to be the thrust of Chino's position.

This is a matter of first impression and there is little external guidance available upon the full range of intended ramifications of § 42–1452. But the nub of the statute, directed at the double taxation of a single transaction, is discussed in the summary of "Arizona Sales and Use Taxes," authored by Patrick Derdenger, one of Prescott's counsel here, in the American Bar Association's *Sales & Use Tax Handbook* (1988), at page 3–16. We quote:

§ 3–132.05. **Multi–Municipal Taxes.** One of the problems with having the various cities and towns impose their own Sales Tax is that one city may impose its Sales Tax on the business activities of a taxpayer who has an office in that city. However, that same taxpayer also makes sales to customers located in another city. That other city may also subject the taxpayer to its Sales Tax because the sales were made to consumers located in that city. The result is obviously double taxation. The city where the taxpayer's office is located and the city where the customers are located both impose their Sales Tax, with some degree of "nexus" existing for each city Sales Tax. Under recently enacted legislation, if this type of situation occurs, the taxpayer need only pay the Sales Tax to the first city and has no obligation to the second city. Under the provisions of what is euphemistically called the "Inter–City Sales Tax Squabble Bill," the two cities must resolve the problem between themselves as to which should receive the Sales Tax in question. If the cities cannot resolve the problem, they are then to go to the Board of Tax Appeals, Division 2. A.R.S. § 42–1452.C. (Footnote Omitted).

The concept of double taxation to which § 42–1452 is directed has generally been kept within narrow confines in the sales tax area. We quote from *Miami Copper Co. Div., Tenn. Corp. v. State Tax Comm'n*, 121 Ariz. 150, 154, 589 P.2d 24, 28 (App.1978):

> Double taxation occurs "when the same property or person is taxed twice for the same purpose for the same taxing period by the same taxing authority ..." *Milwaukee Motor Transportation Co. v. Commissioner of Taxation,* 292 Minn. 66, 193 N.W.2d 605, 612 (1971).

In *Boise Bowling Center v. State,* 93 Idaho 367, 370, 461 P.2d 262, 265 (1969), the court stated:

> There is no double taxation when two separate and distinct privileges are being taxed even though the subject matter to which each separate transaction pertains may be identical.

A fuller statement of the principle is found in *McGowan v. Marx,* 537 So.2d 426, 430 (Miss.1988):

> Double taxation in the prohibited sense can exist only if the subject of both taxes is the same, if both taxes are imposed upon the same property, for the same purpose, by the same state or government, during the same tax period.
>
> . . . . .
>
> There is no double taxation when two separate and distinct privileges are being taxed even though the subject matter to which each separate transaction pertains may be identical, and two separate and distinct levies under the same act on two separate and distinct entities do not constitute double taxation. (Quoting from 68 Am.Jur.2d, Sales and Use Taxes, § 36).

It is clear that within its sphere, § 42–1452 rejects the concept of dual taxability. With its concept of the "superior jurisdictional claim" to impose a tax, it adopts a winner-take-all approach, an approach at odds with apportionment. The legislature has plenary control over the power of municipalities to levy taxes and therefore the only question before us is, what is the intended effect of the statute?

It is clear to us that where two municipalities have fractional shares of a single indivisible transaction, involving essentially the same privilege, as in the case of a sale across municipal lines, only one municipality can be found to have the "superior jurisdictional claim" under § 42–1452(D). There is no indication that we can see, however, that the act is intended to apply to the exercise of distinct privileges. Here, Prescott's self-imposed tax is on the sale of water, while Chino Valley levies its tax on the privilege of operating a pipeline transporting water from one point to another within Chino Valley. The principles that we have cited above lead us to the conclusion that Chino Valley's right to tax the operations of Prescott, which regularly engages in business activities in Chino Valley, are not rendered defeasible by § 42–1452. We reach that conclusion notwithstanding Prescott's argument that the measure of Chino's tax makes it in effect "just another sales tax," identical to Prescott's. The focal incident of transaction privilege taxation in Arizona is the privilege of engaging in business. *Arizona Dept. of Revenue v. Mountain States Tel. & Tel. Co.,* 113 Ariz. 467, 556 P.2d 1129 (1976). Prescott has its water distribution system focused in and around its community, and it also regularly and substantially exercises the privilege of operating its pipeline within Chino Valley.

There is another reason why § 42–1452 does not apply here. Section 42–1452 contemplates one taxpayer and two competing taxing authorities. That symmetry is not present here. Prescott is the relevant taxpayer, obviously under no compulsion to tax itself. There is no double taxation, except for the taxpayer's choice to tax itself.

We therefore conclude that the trial court erred in holding that the matter is to be referred to the Board of Tax Appeals.

## ATTORNEY'S FEES

█ Finally, we address the trial court's denial of attorney's fees to Chino Valley.

Chino Valley's request for attorney's fees was based on A.R.S. § 12–349, which provides for an award of attorney's fees in situations where the opposing party is guilty of specified delaying or oppressive tactics. The trial judge determined that Prescott prolonged and exacerbated the litigation, without justification, so that there

was a basis for granting attorney's fees to Chino Valley pursuant to § 12–349(A)(3). We have reviewed the record and believe the trial court acted within its discretion in reaching that determination.

The trial court nevertheless denied Chino Valley's request for fees on the grounds that its counsel failed to present the proper specific basis of their claimed charges, then totalling over $74,000, with the specificity required by *Schweiger v. China Doll Restaurant, Inc.*, 138 Ariz. 183, 673 P.2d 927 (App.1983). The trial court did not preclude a further presentation.

Chino Valley's counsel resubmitted its request in April of 1987. At that time the requested fees totalled some $78,000. While the second submission incorporated some slight improvement in specificity, it still failed to present the claimed charges in a clear, plain manner and was in a form which required the trial judge to refer to a separate key or code for explanations of the charges.

In denying the claimed fees, the trial court noted that there were some services claimed by counsel that were outside of the litigation. The trial judge stated:

> "The Court finds Chino Valley's Request for Attorney's Fees contains an insufficient description of what hours were spent *specifically on what services.* The Court believes that Prescott has unnecessarily lengthened the proceedings by resisting any attempt to calculate the tax due. However, the Court has insufficient information from which to determine reasonable attorney's fees for Chino Valley as a result. *See, Schweiger v. China Doll,* 138 Ariz. 183 [673 P.2d 927]." (Emphasis in original).

On appeal, Chino Valley points to Prescott's trial court conduct and the obvious expenditure of efforts by Chino Valley's counsel and argues strenuously that there should be an award of fees in some magnitude, even if the counsel's showing was in some respects deficient. Chino also argues that the claim and request were in fact adequately detailed.

We believe that the trial court was justified in holding the claim for fees insufficiently supported with adequate detail. The presentation of a claim for attorney's fees should be a plain, complete-in-itself statement demonstrably confined to the matter for which fees are recoverable. It need not be and should not be prolix, but it should stand on its own as a documented communication. These standards are essentially set forth in a straightforward manner in *Schweiger,* 138 Ariz. at 185–89, 673 P.2d at 929–33.

We accordingly agree with the following passage in Prescott's answering brief in the appeal here:

> "Arizona law requires a party seeking attorneys' fees to do more than dump a mound of paperwork on the court with a 'here, you figure it out' attitude."

Chino Valley's argument that there should still be *some* award of attorney's fees is not without force. The entitlement was adjudicated and the substantial efforts expended are apparent. Still, we feel that it would be a step backward for the jurisprudence if we were to in effect put trial judges into the business of making equitable estimates and approximations in situations where counsel failed on two occasions to meet the standards clearly indicated in *Schweiger.*

We therefore reject Chino Valley's appeal in respect to attorney's fees.

Prescott seeks attorney's fees on appeal. It claims them pursuant to A.R.S. § 12–348, which provides for an award of attorney's fees against a municipality.

Under subsection (B) of § 12–348, the court may deny fees if it finds that the party has protracted the litigation. We make such a finding here. It would be anomalous for us to now award fees to Prescott. Assuming without deciding that Prescott is a proper claimant under § 12–348, we deny the request in the exercise of our discretion.

## DISPOSITION

The judgment appealed from is affirmed in part and reversed in part. The cause is

remanded to the superior court for further proceedings consistent herewith.

CONTRERAS, P.J., and EUBANK, J., concur.

Note: The Honorable RICHARD M. DAVIS was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 31.