Filed 7/25/23  P. v. Schumann CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077931 |
| v. | (Super.Ct.No. FSB032415) |
| KATHERINE SCHUMANN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steve Malone, Judge.  Reversed and remanded with directions.

David P. Lampkin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, and Lynne G. McGinnis and Collette C. Cavalier, Deputy Attorneys General, for Plaintiff and Respondent.

Petitioner Katherine Schumann, her boyfriend (and codefendant) Gregory Vance, Jr., and the victim were running a fraudulent check-cashing scam.  Vance and Schumann

1

suspected the victim of taking more than his share of the proceeds. Armed with knives, they went to his home. By the time they left, the victim had been fatally stabbed. The evidence was conflicting as to whether Vance or Schumann was the actual killer. Schumann was convicted of (among other things) first-degree murder, on a felony murder theory, and sentenced to 25 years to life in prison.

The trial court denied Schumann's petition to vacate her murder conviction under Penal Code section 1172.6.[1] She appeals.

Schumann contends that the trial court erred by applying an erroneously low standard of proof. We agree. Although there was a split of opinion at the time, it was the better view — and the Legislature subsequently confirmed — that the trial court had to evaluate the evidence independently, under a beyond-a-reasonable-doubt standard. The trial court, however, expressly stated, on the record, that it was using a lower standard.

Schumann also contends that the error is reversible per se. We disagree. In a section 1172.6 proceeding, the burden of proof is not constitutionally compelled; it is a matter of state law. Thus, the error is not reversible unless it has been shown to be prejudicial.

---

[1]     All further statutory citations are to the Penal Code.

The petition was actually filed under former section 1170.95. (Stats. 2018, ch. 1015, § 4, amended by Stats. 2021, ch. 551, § 2.) Effective June 30, 2022, former section 1170.95 was renumbered as section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will use section 1172.6, somewhat anachronistically, to refer to whichever one of the two statutes was in effect at the relevant time.

2

Schumann, however, alternatively contends that the error was prejudicial even under this standard. We agree. In light of the whole record, there is a reasonable probability that, if the trial court had applied a beyond-a-reasonable-doubt burden of proof, it would have granted Schumann's petition. Accordingly, we will reverse and remand for reconsideration.

I

STATEMENT OF FACTS

A.    *Preface*.

The People requested judicial notice of specified portions of the trial record. The trial court never expressly ruled on that request. However, at the evidentiary hearing, the People drew the trial court's attention to specific trial testimony and exhibits. In their statements of fact in their appellate briefs, both sides cite to the trial evidence. At Schumann's request, which the People did not oppose, we have taken judicial notice of the trial record. We conclude, then, that both sides agree that the trial court did consider and did rely on the trial record, and that we can, too.

B.      *Prosecution Evidence.*

1.      *The check scam.*

Schumann was in a romantic relationship with Gregory Vance, Jr.  They were both involved in a check scam, along with Clifford James,[2] Christopher Daniels,[3] and victim Benny Ellis.  It involved depositing fraudulent checks into Ellis's bank account and withdrawing cash.  Ellis was 59 years old and nearly blind; he used a white cane.  James acted as his caretaker and had access to his ATM card(s).

On October 21, 2001, Vance deposited a $900 check and withdrew $100 (Ellis's daily maximum).  The next day, however, he found that there was only $700 in the account.

2.      *The confrontation at Fanning's house.*

In the wee hours of October 23, 2001, James, Daniels, and Daniels's friend Curtis Fanning[4] were sitting in Daniels's car outside Fanning's house.

---

[2]      James also went by the names Gerrod James Clifford Christian, Jr., Clifford James Christian, Clifford Christian, and Gerrod Clifford.  He was distantly related to Vance; they called each other "cousin."

James testified that he was aware of the scam but not involved in it.  According to all of the other participants, however, he played an essential role in it.  Schumann called him the "ring leader" and "mastermind[]."  Photos showed him at an ATM with Daniels and Ellis.

[3]      Daniels had been charged with murder and burglary.  He pleaded guilty to being an accessory after the fact and two counts of forgery, with an agreed-upon sentence of four years four months in prison, in exchange for his truthful testimony.

[4]      None of the witnesses identified Fanning as a participant in the check scam. James testified that the checks came from Daniels and Fanning collectively, but when

*[footnote continued on next page]*

4

Vance and Schumann came up to the car. Vance "ripped the [driver's side] window out." Both Vance and Schumann were holding knives, six to ten inches long, and waving them around. They wanted to know what happened to money someone had taken out of the bank account. They both said, "[W]here's our fucking money[?]" They were both angry, yelling, and cursing. They were accusing everyone and "making threats to everyone[.]"

Both Vance and Schumann said they were going to Ellis's house — according to Vance, to "straighten things out"; according to Schumann, to "fuck him up." They said if Ellis did not have their money, they were going to "fuck him up" or "take his shit." They ordered Daniels to drive them there, or else they would "fuck [his] ass up." Daniels complied. Fanning went along, at Daniels's request, to protect him; James stayed behind.

### 3. *The confrontation at Ellis's house.*

At Ellis's house, Vance went to a side window, cut the screen, then removed the screen and climbed into the house. Ellis called 911 and reported that someone was breaking into his home. Vance could be heard in the background, saying, "Where's the money at? Where's my motherfucking money?" Ellis then stopped speaking.

Meanwhile, Schumann, holding her knife, went up to the front door, "pound[ed]" on it, and "yelled," "Open the door." Someone let her in. Vance was yelling and saying,

---

asked if Fanning was a participant, he said, "I don't know if he — I never did see him do anything with the checks."

"Do not mess with me." Vance and Schumann then ran back out of the house and jumped into the car.

Vance had a knife in his hand. Fanning saw blood on his jacket; Daniels saw blood on his knife. Schumann was also holding a knife. In the car, Vance kept repeating, "I shouldn't have done the old man like that." He also said, "I got fucking blood on my hands."

Schumann said, "Give me the knife so I can get rid of it." She wiped Schumann's knife off on her clothing, then threw both knives out of the car window near some sewer drains on Baseline.

Meanwhile, James heard noise coming from the direction of Ellis's house. He went to check on him. He saw Vance and Schumann come out of Ellis's house and get into the car; it "took off."

Ellis's front door was wide open. James went inside. There was "stuff throwed all over the house, stuff turned over . . . ." Ellis was in the living room, "slumped over"; his back was soaked in blood. He said, "That bitch got me."[5] James flagged down a police officer who was responding to Ellis's 911 call.

Ellis died at the scene. He had been stabbed twice in the back, causing death. Both wounds were five and a half inches deep. His right eye area was torn and swollen, indicating a blunt force injury. Bloodstain pattern analysis indicated that he was hit in the

---

[5] James never told the police that Ellis said, "That bitch got me." He explained that he was "hysterical" and unable to remember everything.

face at least twice. It also indicated that he was sitting upright when he was stabbed. There was a barbecue fork on an end table in the living room.

Daniels guided police to a drainage ditch near Baseline, where they found a knife and part of a broken knife handle. Ellis's blood was found on the knife. Ellis's blood was also found on Vance's jacket. His blood was not found on Schumann's clothing.

C.    *Defense Case.*

1.    *Vance's account.*

Vance took the stand and testified: "I didn't see it when it actually happened, . . . but [Schumann] is the one that stabbed [Ellis] in the back."

According to Vance, when he found that money was missing from the bank account, he called Ellis, who said he had money for Vance. Vance and Schumann went to his house. The lights were on, but no one answered the door.

Vance and Schumann suspected James of taking the money, so they went to Fanning's house to find him. Vance brought a knife, but only for self-protection. He denied taking it out of his pocket. He did not know that Schumann had a knife. He saw James, Daniels, and Fanning in the car and decided to "scare" them. He broke the window by accident while trying to push it down. "[E]verybody was just yelling at each other . . . ." Vance decided to go to Ellis's house, and to take James along, so they could not each blame the other. However, James refused to go.

7

They went to Ellis's house just to talk to him. There was no discussion of taking anything from him. Vance and Schumann knocked on his door. Vance then went in through the bedroom window; it was open, but he cut and removed the screen.

Vance found Ellis hiding on the floor in the living room. The lights were off.[6] Vance said, "[W]here my mother fucking money at?" Ellis said, "I'm glad you're here. I got your money[.]"

Vance let Schumann in. Schumann and Ellis argued about the money. The phone rang; Schumann looked and said, "911 is on the phone." Vance started to leave the house, but Ellis came at him with the barbecue fork. They struggled, knocked over some furniture, then fell. Vance punched Ellis in the face only once.

Schumann said, "Let's go," and they left. Vance never drew his knife except to cut the screen. He believed Schumann stabbed Ellis while he and Ellis were struggling, to protect him.

Schumann asked for Vance's knife and threw both knives out the car window. That was the first time he knew she had a knife. He had only a few drops of blood on his hands, from punching Ellis. He denied saying, "I shouldn't have done the old man like that."

---

[6] Vance told the police, however, "I flipped on the light."

In an interview on October 25,[7] Vance denied killing Ellis. He said that Schumann must have stabbed Ellis, though he did not see her do it.

In an interview on October 26, however, Vance admitted stabbing Ellis twice in the back. At one point, Ellis was holding the barbecue fork, but he had dropped it before Vance stabbed him. At trial, Vance claimed that he confessed falsely to protect Schumann, who was then pregnant with his child. She later miscarried.

2.     *Schumann's account.*

Schumann also took the stand. She testified that she did not stab Ellis and did not see Vance stab Ellis.

Schumann's participation in the check scam consisted of bringing a blank check to Ellis's house, making it out for $900, signing it with a false name, and endorsing it with Ellis's name.

Vance felt he had been cheated out of some money in the check scam. At his request, she went with him to Fanning's house, although she did not want to go. The plan was just "[t]o talk to everyone."

She always carried a knife for self-protection, because she had been robbed and "roughed up" in previous incidents. It was paring knife with a blade not more than a two inches long. She believed it was legal to carry.

---

[7]     Schumann's jury was instructed that it could consider Vance's "taped interview" on October 25 solely as showing "defendant Vance's demeanor during the interview, and the conduct of the detectives in questioning defendant Vance." As we read it, this instruction did not apply to oral testimony by either Vance or the officer about the contents of the interview. We limit our summary to that oral testimony.

At Fanning's house, Schumann took out the knife and brandished it at James because he walked toward her aggressively. She did not know that Vance had a knife. She suggested that Vance talk to James and Ellis, so they went to Ellis's house.

The porch light was on; Schumann thought no one was home. She saw Vance go toward a window and "heard a screen rip." She went up to the front door. She intended to tell Vance to leave. She heard Ellis say, "[T]hat's enough, that's enough," and Vance say, "Where's my mother fucking money[?]" She knocked, and Vance opened the door.

It was dark; there were no lights on, other than the porch light. Ellis was on his knees. "[H]e looked at [her] like help me[.]" She denied knowing that he had been stabbed. He did not seem to be in pain; she did not see any blood.

She noticed a phone on a couch. A red light was on; she pushed a button to turn the phone off, but then the phone rang. She said, "I think he called the police. Let's go." Vance said, "[G]et out of here," and they left.

While at Ellis's house, Schumann never took out her knife. She did not see any blood on Vance that night. However, Vance did say he had cut his hand and ask for a handkerchief.

Schumann told everyone, "[G]et rid of your paraphernalia," because she thought Ellis had called the police and they might be searched. As she was getting ready to throw out her own knife, Fanning handed her another knife. She did not see any blood on it. Vance told her to throw "those knives" out the window, and she complied.

The morning after the stabbing, the police interviewed Schumann. Her statement was largely consistent with her testimony at trial. However, she said that, when she entered Ellis's house, he was sitting on the floor, and Vance was standing over him. She knew that Vance had hurt him. She assumed that Vance had "hit him a couple of times . . . ." Ellis was trying to use his phone. It rang once; it was Vance who turned it off. It was also Vance who handed her his knife to throw out.

D.     *Schumann's Testimony at the Section 1172.6 Hearing*.

Schumann's testimony at the section 1172.6 hearing was largely consistent with her testimony at trial, except as follows.

She went up to Ellis's front door because Fanning asked her to; "lights were coming on and dogs were barking in the neighborhood." She set only one foot inside the house. She was able to reach the phone because it was on a table by the door; she denied that it was on the couch (contrary to photos of the scene and her own trial testimony). She turned the phone off only because it was a "distraction," not to prevent Ellis from getting help.

II

STATEMENT OF THE CASE

In 2003, Schumann and Vance were tried together before separate juries. Schumann was found guilty of first degree murder (§ 187, subd. (a), former § 189, subd. (a)) and first degree burglary (§§ 459, 460, subd. (a)). She was sentenced to 25 years to

11

life.  In her direct appeal, we affirmed.  (*People v. Schumann et al.* (Aug. 4, 2006, E036689) [nonpub. opn.].)

In January 2019, Schumann filed a petition to vacate the murder conviction pursuant to section 1172.6.  The petition was denied; Schumann appealed.  (*People v. Schumann* (Mar. 2, 2021, E074167) [nonpub. opn.] (*Schumann II*).)

While the appeal was pending, Schumann filed a second petition.  The People filed an opposition, arguing that Schumann was not eligible for relief because she was a major participant in the underlying burglary and acted with reckless indifference to human life.

In March 2021, we reversed the denial of the first petition.  (*Schumann II*, *supra*.)

In July 2021, the trial court (per Judge Steve Malone) found that the first petition stated a prima facie case; he issued an order to show cause and set an evidentiary hearing.

At the evidentiary hearing, in August 2021, Schumann testified.

On September 3, 2021, the trial court denied the first petition.  It issued a statement of decision, in which it explained:  "[T]he court finds there is substantial evidence that Schumann was a major participant in the felony that led to [the victim]'s death.  The court further finds that there is substantial evidence that Schumann acted with reckless indifference to human life."

The trial court considered the following factors, derived from *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*):[8]

"(1) What role did Schuman[n] have in planning the felony that led to Ellis' death?" It noted that she was an active participant in the check-cashing scheme. Along with Vance, she was armed, she was upset about the missing money, and she threatened Daniels if he did not drive them to Ellis's house. She also threatened to "fuck [Ellis] up." She entered Ellis's house. It concluded that "Schumann played an active role in planning the criminal activities that lead to Ellis's death."

"(2) What role did [Schumann] have in supplying or using the lethal weapon?" It noted that she was armed with a knife, that she brandished the knife at Fanning's house, and that she disposed of both her knife and Vance's.

"(3) What awareness did Schumann have regarding the dangers involved or risk of lethal violence?" It noted again that Schumann was armed, that she knew that Vance was armed, that she threatened James, Daniels, and Fanning, and that she threatened to "fuck [Ellis] up."

"(4) Was [Schumann] present at the scene?" It noted that she was inside Ellis's house.

"(5) Was [Schumann] in a position to facilitate or prevent the actual murder?" It noted again that she had threatened to "fuck [Ellis] up" and entered his house. However,

---

[8] Schumann does not contend that the trial court considered erroneous factors nor that it misapplied *Banks* and *Clark*.

13

it found this factor "inconclusive," because it was not clear whether Vance or Schumann was the actual killer.

"(6) What did Schumann do after lethal force was used?" It noted that Ellis's phone rang, that Schumann knew it was the 911 operator calling back, and that she turned off the phone. It also noted again that she disposed of her knife and Vance's.

The trial court concluded that there was substantial evidence that Schumann was a major participant because: "She was actively involved in the check cashing plot. . . . [O]nce she was at Fanning's house she waived a knife, demanded to know where the money was. . . . Schumann joined Vance in demanding that Daniels drive them to Ellis's house to confront Ellis. Schumann threated to personally commit violence to Ellis unless he had the money. Schumann went to Eilis's front door armed with a knife. Schumann entered the house and turned off the phone. She was seen running out of the house with Vance."

It also concluded that there was substantial evidence that Schumann acted with reckless indifference to human life because: "[B]oth Schumann and Vance intended to physically harm Ellis if he did not come up with the missing money." Also, "Schumann was aware that she had an opportunity to seek help for Ellis by answering the 911 operator call back," but she turned the phone off. She left the house without trying to "give aid to Ellis." And finally, once again, she disposed of both her knife and Vance's.

14

Also on September 3, 2021, in reliance on Judge Malone's order denying the first petition, the trial court (per Judge J. David Mazurek) denied the second petition. Schumann appealed solely from Judge Malone's denial of the first petition.

III

ERRONEOUSLY LOW BURDEN OF PROOF

Schumann contends that the trial court applied an erroneously low burden of proof.

A.    *The Applicable Burden of Proof.*

Under section 1172.6, a person who may have been convicted of murder on a felony murder theory is entitled to have the murder conviction vacated, unless either the record conclusively establishes (§ 1172.6, subd. (c); *People v. Strong* (2022) 13 Cal.5th 698, 714–717; *People v. Lewis* (2021) 11 Cal.5th 952, 970–972), or the trial court finds, after an evidentiary hearing (§ 1172.6, subd. (d)(3)), that:

"(1)  The person was the actual killer.

"(2)  The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

"(3) *The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . .*

"([4])  . . . [T]he victim [wa]s a peace officer who was killed while in the course of the peace officer's duties, where the defendant knew or reasonably should have known

15

that the victim was a peace officer engaged in the performance of the peace officer's duties." (§ 189, subds. (e), (f), italics added.)

Section 1172.6, as originally enacted, provided that, at an evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3), Stats. 2018, ch. 1015, § 4.)

Some courts took this to mean that the trial court had to deny the petition as long as there was substantial evidence, even under current law, to support the original jury's finding, beyond a reasonable doubt, that the petitioner was guilty of murder. (E.g., *People v. Duke* (2020) 269 Cal.Rptr.3d 264, 272 (*Duke*), review granted, Jan. 13, 2021, S265309, cause transferred and ordered not citable, Nov. 23, 2021.)

Other courts held that the trial court had to grant the petition, unless it found, independently from the jury and beyond a reasonable doubt, that the petitioner was guilty of murder even under current law. (E.g., *People v. Lopez* (2020) 271 Cal.Rptr.3d 170, 181–182 (*Lopez*), review granted, Feb. 10, 2021, S265974, cause transferred and ordered not citable, Dec. 22, 2021.)

Section 1172.6 was amended, effective January 1, 2022, to resolve this dispute. (Stats. 2021, ch. 551, § 2.) It now provides: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law . . . . A finding that there is substantial evidence to support a

16

conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3).)

The Legislature's intent was to "[r]eaffirm[] that the proper burden of proof at a resentencing hearing . . . is proof beyond a reasonable doubt." (Stats. 2021, ch. 551, § 1, italics added.) In other words, it intended the amendment to be declaratory of existing law. "[S]uch a statement of intent is '"not binding"' on the courts [citation]." (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 428.) However, we agree with *Lopez* that, even before section 1172.6 was amended, it was the better view that the prosecution had to prove guilt beyond a reasonable doubt. The People do not argue otherwise.

Thus, the trial court applied the incorrect standard of proof. It denied the petition because it found *substantial evidence* that Schumann was a major participant and *substantial evidence* that she acted with reckless indifference.

The People argue that the trial court's statement of decision, taken as a whole, shows that it acted as an independent trier of fact. We cannot agree. Admittedly, in subheadings of its statement of decision, it said, "[t]he Court finds that Schumann was a major participant in the underlying crime" and "[t]he Court finds that Schumann acted with reckless indifference to human life," with no qualifying "substantial evidence" language. Nevertheless, in the text, it phrased these findings in terms of substantial evidence. It also it phrased them in terms of substantial evidence in its introduction and its conclusion. If it was actually making these findings independently, its references to "substantial evidence" are inexplicable.

17

B.    *Reversibility Without Prejudice.*

Schumann argues that the error is reversible per se.  However, *People v. Garrison* (2021) 73 Cal.App.5th 735 held that the precise error here — applying the wrong burden of proof at an evidentiary hearing under section 1172.6 — is not reversible per se.  (*Id*. at pp. 745–747; accord, *People v. Garcia* (2022) 82 Cal.App.5th 956, 971–972.)

*Garrison* declined to decide whether the applicable harmless error standard is the federal constitutional "beyond a reasonable doubt" standard (see *Chapman v. California* (1967) 386 U.S. 18, 24) or the state law "reasonably probable" standard (see *People v. Watson* (1956) 46 Cal.2d 818, 836).  It seems clear, however, that the state law standard applies.  "A petition under . . . section [1172.6] is not a criminal prosecution.  [Citation.]" (*People v. Mitchell* (2022) 81 Cal.App.5th 575, 588.)  Schumann has already been convicted of murder.  The Legislature, in an act of grace and mercy, has provided the section 1172.6 proceeding, which reduces guilt and punishment on terms that the Legislature is entitled to prescribe.  (See *People v. Conley* (2016) 63 Cal.4th 646, 656.)

Under these circumstances, most of the federal constitutional protections that attend a criminal conviction do not apply.  (*People v. Mitchell*, *supra*, 81 Cal.App.5th at p. 589 [no constitutional right against double jeopardy]; *People v. Myles* (2021) 69 Cal.App.5th 688, 703 [no constitutional right against self-incrimination]; *People v. James* (2021) 63 Cal.App.5th 604, 611 [no constitutional right to trial by jury]; see also *People v. Lewis*, *supra*, 11 Cal.5th at pp. 972–974 [no constitutional right to counsel; a due process right to counsel at the evidentiary stage but not at the prima facie stage]; but see

18

*People v. Basler* (2022) 80 Cal.App.5th 46, 57–58 [section 1172.6 proceeding is a critical stage at which petitioner has a federal constitutional right to be personally present].)

This includes the requirement of proof beyond a reasonable doubt. The Legislature could have provided that the People's burden of proof is by a preponderance of the evidence; it could even have provided that a petitioner is not entitled to relief as long as there is substantial evidence of guilt under current law. Instead, it required proof beyond a reasonable doubt. However, this is only a state statutory right; a violation of the right is subject to the state law harmless error standard.

C.      *Prejudice*.

1.      *The nature of the error*.

Schumann also argues that, even under the state law standard, the error was prejudicial. Under this standard, "a reviewing court must reverse if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] ""'We have made clear that a "probability" in this context does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.'"" [Citation.]" (*People v. Hendrix* (2022) 13 Cal.5th 933, 944.)

The substantial evidence standard requires the court to view the evidence in the light most favorable to the judgment. (*People v. Renteria* (2022) 13 Cal.5th 951, 970.) The court must presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. (*Ibid*.) If the circumstances reasonably justify the jury's findings, it must ignore circumstances that might reasonably

19

be reconciled with a contrary finding. (*Ibid*.) It may not reweigh evidence nor reevaluate witnesses' credibility. (*Ibid*.) This is as far away from the beyond-a-reasonable-doubt standard that the trial court was supposed to apply as it is possible to get.

2. *The evidence that Schumann was the actual killer*.

Even under the substantial evidence standard, the trial court found the evidence "inconclusive" as to whether Vance or Schumann was the actual killer. However, the evidence that Vance was the killer was much stronger than the evidence that Schumann was. Witnesses heard Vance yelling inside the house, but not Schumann; Vance's voice was also heard on the 911 call. Vance's claim that Schumann stabbed Ellis as he and Ellis were struggling was belied by the blood pattern evidence, which showed that Ellis had been sitting upright when he was stabbed. As Vance left Ellis's house, there was blood on his jacket, his knife, and his hands. He said — not just once, but repeatedly — "I shouldn't have done the old man like that." Ellis's blood was found on Vance's jacket, but not on Schumann's clothing. Finally, after initially telling the police that Schuman was the killer, Vance confessed that he was (although he recanted his confession at trial).

Admittedly, there was James's testimony that Ellis said, "That bitch got me." However, he was impeached somewhat by the fact that he did not tell anyone about this statement until about a month before trial. Moreover, he was Vance's relative and honorary cousin; it is inferable that he was trying to shift the blame to Schumann. In any event, nowadays, "bitch" can refer to a man.

### 3.  *The evidence of reckless indifference.*

Assuming Schumann was not the actual killer, the evidence that she acted with reckless disregard for human life was open to different interpretations.

"Reckless indifference to human life has a subjective and an objective element. [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.]  As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation."'" [Citation.]  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement. [Citation.]"  (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

Five factors are typically relevant to this inquiry.  (*Clark*, *supra*, 63 Cal.4th at pp. 618–622.)  First, "[a] defendant's *use* of a firearm, even if the defendant does not kill the victim or the evidence does not establish which armed robber killed the victim, can be significant to the analysis of reckless indifference to human life."  (*Id.* at p. 618.)  However, "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life.  [Citation.]"

21

(*Ibid*.)  Second, a defendant's physical presence at the scene, while not absolutely required, is relevant, as is the failure to render aid to a victim.  (*Id*. at pp. 619–620.)  Third, "[t]he duration of the interaction between victims and perpetrators" is relevant; "[c]ourts have looked to whether a murder came at the end of a prolonged period of restraint of the victims by defendant."  (*Id*. at pp. 620–621.)  Fourth, it is relevant that the defendant knows that an accomplice has a propensity to violence, especially lethal violence.  (*Id*. at p. 621.)  Fifth, it is relevant that the defendant took steps to minimize the risk to human life.  (*Id*. at pp. 621–622.)  "'No one of these considerations is necessary, nor is any one of them necessarily sufficient.'"  (*Id*. at p. 618.)

Here, both Vance and Schumann were armed with knives.  Schumann claimed she did not know that Vance had a knife; she also claimed that she carried her own knife all the time, for self-protection.  However, witnesses saw them brandishing knives at Fanning's house, while threatening to "fuck up" Daniels and Ellis.  This tends to show reckless indifference.  However, the trial court could also find that the intended crime did not present more risk to life than a garden-variety armed robbery-burglary.  There was no evidence that Vance had a propensity to violence, much less that Schumann knew that he had a propensity to violence.  It must be remembered that more than an objective risk to human life is required.  The defendant must *knowingly* create a *grave* risk of death.  (*In re Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The trial court relied on the fact that Schumann was present at the scene.  However (if one believes her account), she was not present when the stabbing occurred.  Thus, she

22

had no ability to prevent it.  Moreover (and again, if one believes her account), once inside, she could not tell that Ellis had been stabbed.  Both she and Vance testified that the lights were off and it was dark.[9]  It is true that, as the prosecutor pointed out, that there was blood on Ellis's face and on the wall from being hit.  However, Schumann admitted knowing that he had been hit; she simply denied knowing that he had been stabbed.  The interaction between Schumann and Ellis was very brief.

The trial court also relied on the fact that Schumann hung up the phone and did not answer it when the 911 operator called back; thus, she prevented Ellis from obtaining aid.  Again, however, she testified that she did not know that Ellis had been stabbed.  In her view, he had merely been hit.  When he looked at her for help, she thought he wanted her to "say something.  Do something.  Get him out of here.  That kind of help."  She provided it, by saying, "Let's go."

Finally, the trial court relied on the fact that Schumann threw the knives out of the car window.  However, she knew Ellis had called 911, she suspected the police were coming, and she wanted to get rid of any incriminating evidence.  This sheds little light on her mental state when the crimes were committed.

None of this is intended to tell the trial court how it should rule on remand.  As it found, there was substantial evidence that Schumann acted with reckless indifference to human life.  She does not argue otherwise.  On this record, however, if the trial court were to reevaluate the evidence independently, there is a reasonable probability that it

---

[9]      However, Vance did tell police that he turned on a light.  (See fn. 7, *ante*.)

would not be able to find beyond a reasonable doubt that Schumann acted with reckless indifference to human life. (We therefore do not consider the evidence that she was a major participant.) We must reverse and remand.

IV

THE APPROPRIATE APPELLATE REMEDY

We must also determine what we should direct the trial court to do on remand. Schumann contends that we should direct it to hold a new evidentiary hearing. The People contend that we should merely direct it to reconsider the existing evidence.

This turns on whether Schumann has already had a full and fair opportunity to marshal evidence and argument. (See *People v. Rodriguez* (1998) 17 Cal.4th 253, 258; *People v. Rocha* (2019) 32 Cal.App.5th 352, 357–360.) She argues that, at the time, due to the split of appellate opinion discussed in part III, *ante*, the applicable burden of proof was unclear.

Regardless of the burden of proof, however, Schumann needed to argue as strongly as she possibly could that she was not a major participant and did not act with reckless disregard for human life. The People did not hang their hat on a substantial evidence burden of proof; they argued that they had proved their case beyond a reasonable doubt. And, as discussed in part I.A, *ante*, the evidence consisted of the entire trial court record, plus Schumann's testimony. It does not appear that there was any other available evidence.

We conclude that Schumann has already had a full and fair opportunity to litigate. At the same time, however, we should avoid constraining the discretion of the trial court, which knows its own reasoning best. Accordingly, we will give it the opportunity to receive further briefing, evidence, and/or argument, if it chooses, in its discretion, to do so. (See *City of Los Angeles v. Shell Oil Co.* (1971) 4 Cal.3d 108, 128.)

V

DISPOSITION

The order appealed from is reversed. On remand, the trial court must reconsider the petition in light of the views expressed in this opinion. It will have discretion to receive additional briefing, evidence, and/or argument if, and to the extent that, it deems necessary or advisable. However, unless it sets a briefing and/or hearing schedule within 30 days after our remittitur issues, the matter will be deemed to have been submitted on the date of the remittitur. Again, we express no opinion on how the trial court should rule.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

CODRINGTON
J.

25